PHILCO CORPORATION, Plaintiff,

v.

ADMIRAL CORPORATION, Defendant.

Civ. A. No. 2098.

United States District Court
D. Delaware.

Nov. 29, 1961.

Alexander L. Nichols, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Dexter N. Shaw of Howson & Howson, Philadelphia, Pa., and Thomas M. Ferrill, Jr., Philadelphia, Pa., for plaintiff.

Henry M. Canby of Richards, Layton & Finger, Wilmington, Del., Howard W. Clement and Granger Cook, Jr., of Byron, Hume, Groen & Clement, Chicago, Ill., for defendant.

CALEB M. WRIGHT, Chief Judge.

This is a civil action brought by Philco Corporation, a Pennsylvania corporation, having its principal place of business in Philadelphia, against Admiral Corporation, a Delaware corporation, having its principal place of business in Chicago, Illinois. The action is brought under the Patent Act, 35 U.S.C.A. § 1 et seq., the complaint charging defendant with infringement of three patents presently owned by Philco. The usual prayers for an injunction and an accounting have been included. The defendant has denied infringement, alleged that all three patents are invalid for various reasons discussed herein, and asserted a demand for a declaratory judgment holding the patents invalid or alternatively, not infringed. Trial was had on validity and infringement, the issue of damages being severed pending determination of liability.

Two of the three patents in suit are design patents. The first is Design No. 183,692 ('692 patent) and is an "ornamental design for a portable television receiver". The second is Design No. 186,134 ('134 patent) and is an "ornamental design for a back panel for a portable television receiver". The third is apparatus patent No. 2,917,577 ('577 patent), relating generally to the arrangement of a portable television receiver cabinet and picture tube, the chassis in relation to them, and the oblique arrangement of the parts relative to the chassis and the axis of the set.[1]

The three patents have allegedly been embodied in a portable television receiver

1. See Stipulation by plaintiff's counsel, N.T. 536.

marketed commercially as the Philco "Seventeener III" or Philco "Briefcase Portable". The receiver has a generally convex front and back and a center wraparound. The back has a protrusion so as to accommodate and protect the rear neck of the picture tube, and there is a rectangular step surrounding the generally convex forms of the front and back. The picture tube window is in the center, and on the top of the wraparound are a handle and the controls. The net result is a pleasing design which creates an illusion of thinness by drawing the eye to the relatively thin center wrap. The step, convex curvature of front and back, and employment of a cup or protrusion on the back all tend to minimize the actual depth of the receiver as it appears to the eye. The cabinet has, in the words of the '577 patent, "the approximate shape of a small suitcase or briefcase." [2]

Full-scale marketing of the Philco Seventeener III began in June, 1958. In March, 1959, Admiral announced and placed on sale a portable television receiver known as the Admiral "Thinman". This device employed many of the same techniques designed to accentuate the center wrap and to create an illusion of thinness. Philco, having been granted the '692 patent, then began this action. On May 11, 1959, subsequent to the initiation of this suit, applications were filed which resulted in the '134 and '577. Appropriate amendments to the pleadings were made so this litigation would encompass the later patents.

■ The Court finds all three patents invalid. Findings on the questions of infringement and prior sale or public use will also be made. Rule 52(a), F.R. Civ.P., 28 U.S.C.A., does not require such extensive findings, and there is some authority to the effect that such findings should not be made.[3] Nevertheless, in protracted litigation such as this, a District Court normally must review the whole record and enable itself to make such findings regardless of whether they are ultimately needed. To apply a hard and fast rule in such a situation might well lead to the wasting of resources readily available and potentially helpful to an appellate court. It is a matter which should be left to the discretion of the trial court and should be determined in the light of all the circumstances.[4]

## I. The '692 Patent

The claim of the '692 patent (Appendix "A" herein) is for an "ornamental design for a portable television receiver". It consists of one drawing, that being a front perspective view. Because of this, no configuration for the back is shown. The patent, however, states, " * * * [T]he back is unornamented."

A front view of the design shows a portable television receiver basically rectangular in shape, the major axis of the rectangle being horizontal.[5] Each corner is rounded. The next element, looking from the front, is another rectangle in the form of a step. It is curved or spherical both horizontally and vertically and recedes toward all four corners. There is also a third rectangle formed by a bead which encloses the area substantially filled by the picture tube window. The area enclosed by the step, or second rectangle, appears to conform generally to the curvature of the picture tube window.

The patent drawing also shows that the sides consist of a wraparound extending from the base of one side over the top and down the opposite side.[6]

---

2. PX 3, column 1, lines 50–51.

3. 5 Moore's Federal Practice, ¶ 52.06 [1] and authorities cited therein.

4. In the present case, the Court has reviewed the whole record and has done substantial legal research on each major issue. Findings and conclusions will be made on each issue. These findings, however, will not cover every aspect of each question but will merely be sufficient to resolve the particular issue raised.

 For reasons stated in the body of this opinion, no findings are made as to infringement of the '692 patent.

5. N.T. 94–98.

6. The patent states the side of the receiver not shown is substantially the same in appearance as the side shown.

This wraparound is enclosed within two beads near the outside edge. These beads appear farther apart at the bottom than at the top. There is also a radius at the point where the front, sides and top meet. On top there is a handle containing two antennae which can be extended. The handle is straddled at its extremities by two control knobs which appear to be tilted forward.

The design represents a compact television set which, in view of the size of the picture tube, appears thinner than any previous model.[7] It is a symmetrical design achieved through concentricity of the various rectangles, the straddling of the handles by the controls, and the centering of the picture tube, which, like the various rectangles, has greater width than height. Nevertheless, the dominant features which give the receiver its distinctive appearance are the relatively small wrap, the step, and the general conformance of the greater part of the front face to the curvature of the picture tube. These are the features which do the most to create the optical illusion of thinness.

a) *The Sufficiency of the Disclosure*

■■ 1. The Court is met at the outset with a question as to the sufficiency of the disclosure made in the '692 patent.[8] Design patents, like mechanical patents, are subject to the statutory mandates governing disclosure. 35 U.S.C.A. § 171. A design patent must disclose the configuration and complete appearance of the article in which the design is embodied so fully, clearly and with such certainty as to enable those skilled in the art to make the article without being forced to resort to conjecture. Ex parte Salsbury, 38 U.S.P.Q. 149 (1938); Ex parte Sweeney, 123 U.S.P.Q. 506 (1959); James E. Tompkins Co. v. New York

Woven Wire Mattress Co., 159 F. 133 (2 Cir. 1907). Sufficient disclosure has been said to be the *quid pro quo* for the limited monopoly granted by the government. It is necessary so that those skilled in the art may learn the invention and practice it when the period of monopoly is over. Universal Oil Products Co. v. Globe Oil & Refining Co., 322 U.S. 471, 64 S.Ct. 1110, 88 L.Ed. 1399 (1944). The disclosure cannot be so vague as to compel independent experimentation by others to ascertain the bounds of the claim. Standard Oil of California v. Tidewater Associated Oil Co., 154 F.2d 579 (3 Cir. 1946). Sufficient disclosure is also required so that the industry concerned will be apprised of the precise scope of the monopoly asserted. Universal Oil Products Co. v. Globe Oil & Refining Co., supra. Furthermore, inadequate disclosure may well hinder the judicial determination as to whether the purported novelty and invention are genuine. Pennsylvania Crusher Co. v. Bethlehem Steel Co., 193 F.2d 445 (3 Cir. 1951).

■■ The '692 patent fails to meet these requirements and is, therefore, invalid. The validity of the design patents involved in this litigation must be determined by reference to each patent standing alone.[9] The fact that a patent's usefulness or appearance is enhanced when combined with another patent is of no significance. Moreover, " * * * plaintiff must stand on his patent as issued; its meaning, intended significance, and asserted scope must be primarily learned from the four corners of the document as it stands * * *." Whiting Mfg. Co. v. Alvin Silver Co., Inc., 283 F. 75, 80 (2 Cir. 1922).

The '692 patent purports to be an "ornamental design for a portable television

7. N.T. 99.

8. Defendant, in accordance with 35 U.S. C.A. § 282, pleaded insufficient disclosure as an affirmative defense. Par 10(f), Answer and Counterclaim. Subsequent to the trial and the filing of briefs, the Court, by letter to counsel, requested memoranda on the issue.

9. One reason why the Court requested further memoranda on this issue was that counsel for both sides at trial varied their references between sets with configured backs or the patent standing alone, depending upon which was best suited to the particular argument they were making. In rendering a decision in this case, the Court is not free to take such liberties.

receiver". Although there is no configuration for a back shown in the drawing, the patent states, " * * * [T]he back is unornamented." It is apparent, therefore, that Philco attempted to patent a design for a whole receiver, and not, as it was contended at trial, simply a design for the front, top, and sides. This is the scope of the patent as determined by the rule laid down in the Whiting case, supra, and the adequacy of the disclosure must be determined by reference to the scope asserted.[10]

Because there is only a front perspective drawing and because the patent states the back is unornamented, a reasonable inference is that the back was intended to be plain and relatively flat. This inference is fortified by certain design patents cited by plaintiff which show only a front perspective view.[11] In each of these, it is apparent that the back of the particular device is plain and relatively flat. If the '692 patent was intended to encompass a plain, flat back, two results follow. First, the Philco Seventeener III does not embody the patented design. Second, the Admiral Thinman receiver does not infringe the patented design because its back has substantial depth and configuration.

But present television technology would prevent any design such as the '692 drawing from having a flat back because the length of picture tubes and the size of other components is too great to be encompassed by the relatively small wraparound shown therein. Reference to the Seventeener III receiver itself clearly demonstrates this, for it utilizes a back which, except for ventilation holes, is similar to the '134 design.[12] In any case, use of the '692 patent is not possible without employing a back of substantial configuration. This back might, however, have several different forms. As stated in plaintiff's brief, "It could be pyramidal, or it could be a truncated pyramid. It could consist of a series of rectangular portions of progressively smaller height and width extending toward the rear. It could include an attached cylindrical shell or rectangular box portion for further extension in its generally central area, to accommodate a picture tube neck." [13] This is not exhaustive, but it clearly demonstrates that use of the '134 design does not *necessarily* result from use of the design shown in the '692 patent.[14]

2. The Court finds, under the circumstances present in this case, the configuration of the receiver back is an integral part of a design such as the '692 patent and the failure to portray such a configuration is fatal to the patent, regardless of its intended scope.[15] The ostensibly compact and thin form of the '692 design and the Philco Seventeener III results in large part from the decision *not* to use a flat back. By employing a back with substantial configuration, the use of a relatively small wraparound becomes feasible. The relationship between the depth of the

10. The Court finds, however, the patent drawing would be inadequate even if the claim had been restricted to top, front, and sides. A configured back is an integral and necessary element of this type of design. See notes 12–18, infra, and accompanying text. The deficiency could have been cured, perhaps, through the use of patent office procedures allowing dotted and full line illustration to differentiate elements immaterial to the claim from those which are material. Whether this would have been sufficient need not be determined, for no such procedure was employed.

11. See Appendix B, Plaintiff's Memorandum in Reply to the Court's letter of June 2, 1961.

12. The Seventeener III back has a depth of approximately 4 inches. *This is about one-third of the total depth dimension of the Seventeener III.*

13. Plaintiff's Memorandum in Reply to the Court's letter of June 2, 1961, p. 3.

14. The back configuration will depend to some extent upon the type of chassis desired, and the size of particular components. While the '134 design is *one* of the obvious expediencies, see section on the validity of '134 patent, infra, it is not a *necessary* result of the partial '692 design.

15. See notes 10–11, supra, and accompanying text.

wraparound and a back with substantial configuration is clear in the record. At trial, defendant put on a demonstration employing a Philco Seventeener II, DX 15, a predecessor of the Seventeener III and a receiver with a wraparound of substantially greater depth than that portrayed in the '692 drawing. The Seventeener II wrap had been cut down by 2 and 7/8 inches even though the picture tube had decreased in length during the relevant time period by only 1 and 5/8 inches. Plaintiff has argued the amount cut off was an arbitrary choice employed solely to increase the similarity between DX 15 and the '692 drawing. This is true, but, as defendant's expert testified, such a choice becomes feasible through the use of some kind of configured back.[16] If, then, this demonstration is misleading, as it is, that is solely because the use of a configured back is a *sine qua non* of the '692 design. Further support is found in the record in the testimony of Mason, once a designer for Admiral. He testified in reference to DX 34(b), a design quite similar to the Seventeener III which he had done in June, 1957, that a side view was given because the protective guard for the picture tube neck is "an integral part of the design".[17] Moreover, it is highly significant that the inventor of the '692 and '134 patents, Harman, created the configuration of the front, wrap, and the convex, compound curvature of the back at about the same time.[18] Indeed, the curvature of the back is substantially the same as the curvature of the front. He did not create the '692 design and then design the back as severable and distinct from the front.

Not only is the creation of the '692 design conditioned upon use of a configured back, but its very appearance depends upon what configuration the back takes. PX 111, 148, 149 and 150 demonstrate clearly the form of back used can have a very substantial effect upon the appearance of a portable receiver as a whole. As an example, a back with substantial depth near its outside periphery will destroy the illusion of thinness achieved when a back such as that portrayed in the '134 patent is used. Indeed, it is the back of the Seventeener III, as much as the front, which accentuates the small wraparound and creates the illusion of compactness. In effect, then, the '692 drawing may have a quite different overall appearance, and, therefore, be a quite different design, if used with one back rather than another.

In Ex parte Northup, 24 U.S.P.Q. 63 (1932), the applicant was attempting to secure a patent for an ornamental design for a forward corner of an automobile body. In rejecting the application it was stated:

" * * * ` [T]he rounded front corner of the application might have a materially different effect when incorporated in one old configuration of body from what it would have when incorporated in another old configuration of body. This is also true even though both configurations belong to the same general type as, for instance, a sedan. The rounded front corner when taken in connection with a rounded rear corner as shown in the added view of Fig. 4 may well have a more pronounced effect than it would if incorporated in a sedan body of the old square cornered type. In other words, in the complete design the configuration of the rounded corner to a greater or less extent blends and harmonizes with the configurations of the other portions of the body. Therefore, applicant does not have the same design when his front corner is incorporated in a body of one configuration as when it is incorporated in

---

16. N.T. 976–984.

17. N.T. 1044. Credibility may be attached to such statements because the importance of the disclosure issue was not apparent until after the trial had been completed.

18. See DX 107–A and DX 80, pp. 237–238. The use of a cup or protrusion in the center of the back had also been decided upon although its precise configuration was not determined until later.

a body of another configuration." Id. at 64.

Although the Northup decision involved what is perhaps a more extreme set of facts than those in the present case, the problem is essentially the same. Because the '692 patent drawing fails to show a back configuration and some substantial configuration is necessary to house the picture tube neck and other components, it is impossible to discern from the patent what the overall appearance of the set will be. It is, moreover, impossible even to discern what the overall effect upon the eye of the '692 drawing itself will be without knowing the proposed back configuration.

■ The design patent laws are intended to protect that which gives a distinctive appearance to an article of manufacture. Gorham Mfg. Co. v. White, 81 U.S. 511, 20 L.Ed. 731 (1871). The design as a whole, not the dissected individual elements, provides the frame of reference for determination of validity and infringement. But here the patents themselves have dissected a single, unitary design into two elements. A design generally consists of contour and/or ornamentation. It is clear that the contour or configuration of the television receivers in issue is a vital part of the contested design. Indeed, were the question of contour eliminated and superficial ornamentation the only remaining issue, a finding of non-infringement would be made without hesitation.[19] It has been held that when contour is an important part of a design, failure to disclose it fully in the drawing will be fatal to the patent. Ex parte Mygatt, 171 O.G. 1257, 1911 C.D. 186.

3. The failure to disclose a back configuration on the '692 patent is of twofold significance. First, what configura-

tion the back will have is unknown even though some substantial configuration will be necessary for technological reasons. Second, the overall aesthetic effect of what *is* shown in the '692 drawing cannot be known until a back has been chosen. This does not satisfy the disclosure requirements. It fails to enable those skilled in the art to learn and practice the invention. Universal Oil Products Co. v. Globe Oil & Refining Co., supra. It would compel those attempting to practice the invention to engage in independent experimentation to ascertain which designs are best suited to house the neck of the picture tube and other electronic components and which create the best overall appearance when combined with the '692 design. This is not permissible. Standard Oil of California v. Tidewater Associated Oil Co., supra. Nor does the '692 drawing apprise the television industry of the precise scope of the monopoly asserted. As stated previously, the configuration of the back chosen to be applied to the '692 design may well affect its overall appearance. But infringement is to be determined by reference to the overall effect upon the eye of the ordinary observer of the patented and accused devices. Gorham Co. v. White, supra. Infringement of the '692 design, therefore, may, if the patent is valid, turn on the choice of back configuration even though the '692 patent shows no back whatsoever. As plaintiff states in its memorandum on this issue, "The '692 patent covers any portable television receiver having the illustrated design with any back *not inconsistent with the appearance of the set as presented in the '692 patent drawing.*" (Emphasis supplied.)[20] Plaintiff cannot be permitted to cast upon its competitors the burden of determining through experimentation what forms of backs are consistent

---

19. The difference in treatment of the front face and handle alone would be sufficient for this limited purpose.

20. Plaintiff's Memorandum, supra, p. 16. Plaintiff implies that it is doing the television industry a favor by leaving it "unrestricted" in its choice of backs. This

lack of restrictions, however, results in a failure to teach what is necessary to use the '692 drawing and leaves the problem of infringement in a state of dangerous uncertainty. Philco's gift to the industry here is a Trojan Horse.

or inconsistent with the '692 patent and thereby compel them to determine the scope of the monopoly asserted. Universal Oil Products Co. v. Globe Oil & Refining Co., supra.

Moreover, the inadequacy of the '692 disclosure effectively prevents the Court from applying the legal standard of infringement. The test for infringement of a design patent has been stated as follows:

"* * * [I]f, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other." Gorham Mfg. Co. v. White, supra, 81 U.S. at 528.

The test for infringement, then, is whether the accused device produces the same aesthetic effect upon the eye of the ordinary observer as the patented design. Minor variations in a design will not save one from liability unless they be sufficient to change the overall effect upon the eye.

The insufficiency of the disclosure made by the '692 patent, however, prevents a comparison between the patent drawing and accused device. A back of substantial configuration is, because of technological necessities, an integral part of a design such as the '692 patent and an essential factor governing the overall effect upon the eye of what *is* shown in that drawing. A comparison of the drawing with a receiver embodying a back panel, therefore, cannot be made without indulging in certain assumptions not justified by the disclosure of the patent. The most important assumption, of course, relates to the back. If one kind of back is assumed, there may be infringement; if another is assumed, there is not. Even if the Court assumed a back configuration which generally preserved

the illusion of thinness created by the relatively narrow wraparound, it might have to restrict the comparison to frontal or front perspective views lest differences in back design, when viewed from the side, affect the overall appearance of the front, top and sides.

The patent laws do not contemplate such unhampered judicial speculation in their enforcement. It is the patentee's duty to define with precision the scope of his claims in the patent itself and thereby provide all elements necessary for a judicial determination of infringement. If an element is missing, he cannot expect the Court to assume it for him. Because findings on infringement would require assumptions wholly unwarranted by the '692 patent, no alternative findings will be made on that question.

4. The failure of the '692 patent to disclose a back configuration has also beclouded the issues of invention and novelty. The design of the Seventeener III, employing a handle, a relatively small, beaded wraparound, a generally symmetrical, convex front and back and rounded corners is closely related to prior art in the luggage field. See tabs 4 and 5 of DX 2, DX 19, and DX 21. The use of these luggage techniques, moreover, has been extensive in the electronics field, especially in portable radios.[21] DX 6, for instance, a Telefunken portable radio, incorporates these luggage concepts. To be sure, there is no danger of anyone's confusing any of these exhibits with the Seventeener III, for the picture tube alone would prevent that. But the distinctions result from functional differences between the articles, not from differences in the application of designing skill. The design patent laws are intended to reward the inventive effort, not the non-inventive result, regardless of how new the design may be in the narrow field in which it is employed. The Seventeener III is merely an adaptation of a form used in the luggage field and al-

21. The '577 patent states in its first sentence that the desire for portable televi-

sion receivers is a result of the popularity of portable radios.

ready transplanted into electronics. The delay of its introduction into television resulted primarily from technological difficulties,[22] not from the unobviousness of its applicability. Once the technological problems had been surmounted, the neck of the picture tube shortened, and other components miniaturized, the adaptation of this form to television was not only obvious, but also inevitable. The selection of an old form and its adaptation to a new use is not an exercise of the inventive faculty. Smith v. Whitman Saddle Co., 148 U.S. 674, 13 S.Ct. 768, 37 L.Ed. 606 (1893); Capex Co. v. Swartz, 166 F.2d 5 (7 Cir. 1948); Blisscraft v. Rona Plastic Corp., 123 F. Supp. 552 (S.D.N.Y.1954).

As pertinent as the luggage prior art might be to the design of the actual television receiver, the Philco Seventeener III, its applicability to the '692 patent has been beclouded by the dissecting and severing of the Seventeener III's unitary design and Harman's single invention into two patents. For the choice of a back configuration is determinative of the applicability of the prior art exhibits cited. Plaintiff here is attempting on the one hand to secure the commercial benefits resulting from the use of an old form and on the other to obtain a patent monopoly on this form by limiting its disclosure so as to avoid the relevant prior art. It is not insignificant to note in this respect that in the one patent which gives a side view of the complete Seventeener III, the '577 patent (with Harman, the '692 and '134 inventor, as a co-inventor), the remark is made that the "cabinet shell * * * has the approximate shape of a small suitcase * * *."[23] The Court of Appeals for this Circuit has noted that one of the vices of an inadequate disclosure is that it prevents a proper evaluation of the alleged invention in terms of the prior art. Pennsylvania Crusher Co. v. Bethlehem Steel Co.,

supra. This would seem to be a classic case of that nature.

■ 5. Plaintiff has asserted that a generally frontal perspective view is particularly appropriate for television receivers and has cited several design patents as support. It suffices to state here that in each the back of the receiver is apparently plain and flat.[24] The Court believes the correct rule was stated in Ex parte Salsbury, 38 U.S.P.Q. 149 (1938):

"* * * The disclosure should leave no uncertainty as to what constitutes the patented design * * *. Different types of articles require different forms of illustration, and hence no single rule can be made to fit all cases * * *.

"It is recognized that flat articles can generally be sufficiently illustrated by a single view. Likewise articles of a symmetrical nature are often sufficiently illustrated by a single well-executed perspective view, since it can be deduced with certainty from that one view how the article would appear from the other * * *.

"With articles which are unsymmetrical and *which present different appearances from different points of view, one figure from a single point, however well executed, is not sufficient for complete disclosure.*" Id. at 151. (Emphasis supplied.)

Nor is the fact that the backs of television receivers are usually unimportant and not seen in advertisements, on display, or in the home persuasive. From the design point of view, the back here is critical for it makes the front and side design possible and is vital to the overall appearance of the set. Indeed, the effect of the back design of the Seventeener III upon the appearance of the set as a whole has not been ignored by

22. See text infra.

23. PX 3, column 1, lines 49–50.

24. See note 11, supra, and accompanying text. Plaintiff's reliance upon Gorham Co. v. White, supra, is also misplaced. Neither the sufficiency of the disclosure nor the validity of the patent was challenged in that case. See 81 U.S. at p. 512.

plaintiff in its advertising.[25] Moreover, in contrast to console models, these sets are allegedly portable, and the purchaser is encouraged by advertising to carry them around. This clearly enhances the importance of the back. Plaintiff's reference to patent office procedures allowing an applicant to emphasize dominant or material features is also of no aid, for it did not attempt to employ these procedures. No dominant feature clause was inserted, and the immaterial was not differentiated from the material by dotted and full line illustration.[26]

## II. The '134 Patent

The '134 patent, (Appendix "B" herein), is an ornamental design for a back panel for a portable television receiver. It consists of two drawings, a perspective view and a side elevational view. The perspective view includes dotted lines representing a small side or wraparound of a portable television receiver. Both drawings portray the back as being of solid material without any holes or slots for ventilation purposes.

The perspective view shows the design as being rectangular, the major axis of the rectangle being horizontal.[27] The corners are rounded in the form of radii. The outside perimeter is formed by a bead surrounding a small shoulder or step. This portion, when applied to a receiver such as the Philco Seventeener III, would appear as the rearward bead and peripheral portion of the wraparound. This step then falls off much like a rounded shoulder until it reaches another step which forms an inner rectangle on the back. This step is spherical in form and recedes toward the four corners of the rectangle. The rectangle encloses a large area which is spherical in shape and made up of convex, compound curves. Approximately in the center of this area is a cup or protrusion. It is somewhat like a pyramid with a plateau being the nearest thing to the eye. It extends forward in tapering facets towards the plateau.

### a) *Validity of the '134 Patent*

To be patentable, a design must be a step beyond the prior art. But the fact that a design can be distinguished from the prior art does not necessarily import patentability. See Burgess Vibrocrafters, Inc. v. Atkins Industries, Inc., 204 F.2d 311, 314 (7 Cir. 1953); Shoemaker, Patents for Designs § 31 (1929). It is the inventive effort which is sought to be protected by the patent laws, and while the design result is a factor clearly to be taken into account by the Court, it is at best only evidence of the character of the effort. But as in any other legal problem, the ultimate conclusion is to be drawn from all the evidence available. As one Court has said, "It is not enough merely to say that the design is new and pleasing to the eye. Its conception must require that exceptional talent which is beyond the skill of the ordinary designer." Burgess Vibrocrafters, Inc. v. Atkins Industries, Inc., supra at 313.

In the present case, there is testimony and documentary evidence concerning the effort which resulted in the '134 drawing. Harman, the inventor, was under a directive from his superiors at Philco to make the "thinnest-looking set you could make."[28] The impetus for the program began with Philco's belief that it could develop a short, short neck 110° picture tube.[29] In accordance with that directive, he created a set with a step arrangement on front and back, a generally convex front and back, and a relatively small center wraparound. The convexity of the front was determined by the curvature of the picture tube. The convexity of the back was of the same curvature.[30] This achieved general symmetry between front and back and was accomplished fairly early in the pro-

---

25. See DX 116, 121, 139.

26. This procedure *was* used in the '134 patent.

27. N.T. 134–139.

28. DX 81, p. 434.

29. DX 80, pp. 196, 333; DX 81, pp. 431–432, 538, 540, 680–681.

30. DX 107–A.

gram.[31] The only thing left undone at this time was the design of the cup to house the neck of the picture tube. Harman's original design was for a spherical bump. This was rejected by management, however, and Harman made several proposed bumps of clay, one of which was finally accepted.

The concept of designing articles with generally symmetrical fronts and backs is old. Reference to the luggage prior art previously cited demonstrates this clearly. In adapting that form factor to electronic equipment, the technique of symmetry has been employed, as in the Telefunken portable radio, DX 6. Moreover, television receivers have previously been designed which have convex front faces generally conforming to the curvature of the picture tube and convex backs with the same general curvature as the front. See the Magnavox receiver, DX 9.[32] To adapt this technique to this particular television set is not what the Court regards as the exercise of skill greater than that enjoyed by the ordinary designer, especially since it is an obvious follow-through in terms of the luggage form factor. The concept of employing a cup on the rear of the television receiver is also old, and, indeed, the cup shown in the '134 drawing is no more than a variation upon one shown in Seever patent No. 2,696,609.[33]

 Plaintiff would escape this art by stressing the fact that none of these prior art exhibits have the same overall appearance as the '134 patent (the Seever cup is shown on a flat back). But this again emphasizes the result to the

exclusion of the effort exerted in reaching it and would render patentable the use of any obvious expediency so long as the result has a somewhat different appearance than anything in the prior art. The contribution to the art must be commensurate with the protection sought through the patent system. The '134 patent fails to meet that standard.[34]

 This is not a holding that '134 design is a *necessary* result of the front and side treatment of the '692 design.[35] It is not, for there are several possibilities, some which would retain the illusion of compactness, others which would destroy it. The creation of symmetry and use of the cup device, however, is a fairly obvious expediency and wholly consistent with the luggage approach.

b) *Infringement of the '134 Patent, Assuming Validity*

A lengthy comparison of the '134 drawing with the Admiral Thinman back is unnecessary. They seem generally the same, except for two important differences. The first is that the cup on the Admiral set is far more like the Seever patent cited above than it is like the cup on the '134 drawing. Nevertheless, this does not mean there is a great difference, because the '134 cup is only a variation on the Seever patent to begin with. This points up, however, plaintiff's dilemma in claiming both validity and infringement.

The principal difference, and the one this finding turns on, results from the fact that the '134 drawing shows a solid back while the Admiral back is substan-

---

31. See note 18, supra.

32. The Magnavox back has a flat area in the center so it is not wholly symmetrical with the curvature of the picture tube window. Nevertheless, the area surrounding this flat surface does have such a curvature.

33. DX 2, tab 22.

34. Plaintiff has properly pointed out the dangers of a "hindsight" approach in which what seemed insuperable before the fact seems easy after. Nevertheless, the analysis here is based upon testimony

and documents from Philco, along with designing techniques and prior art existing at the time. There is "hindsight" in every patent case because, if for no other reason, there cannot be a trial before the conception and reduction to practice of the alleged invention.

35. At times plaintiff has seemed to argue that patentability exists whenever an advance is not *necessarily* the result of existing art or other conditions. This is not the legal standard. See 35 U.S.C.A. § 103.

tially covered by over 300 rectangular ventilation slots. The expert testimony as to whether the slots create a substantial difference in appearance between the '134 patent drawing and the Admiral back was, as might be expected, inconsistent. Plaintiff's witness testified that the eye would respond first to the overall appearance of the back as created by its general proportions and highlights.[36] The eye would respond to the slots only secondarily because they were a functional element made as unobtrusively as possible. He testified further that if the designers involved had desired to make a "big thing" out of the slots, they would have been highly decorated as louvers, cross bars, screens, or the like.

While the Court believes this testimony was sincerely given, it is not an accurate application of the design patent laws to the facts of this case. The question of *validity* of a design patent is to be governed by the nature of the effort exerted by *one skilled in the art*. *Infringement,* however, is determined by the overall effect upon the eye of *the ordinary observer or purchaser*. Gorham Co. v. White, supra. A designer, comparing the '134 drawing with the Thinman back, might well disregard the presence of the slots because they are a functional element. An ordinary purchaser, however, caring little whether the slots were a functional necessity or a supreme design effort, would never be induced to purchase one thinking it was the other. The slots on Thinman back, whether they add to, or detract from, its general appearance, nevertheless affect it greatly.[37] By far the greatest part of the curved surface of the Thinman back has these ventilation slots, and they would have a definite effect upon the eye of the ordinary purchaser. Not only are they so large and in such numbers as to be plainly noticeable, but they also affect

the highlight resulting for the step or shoulder near the top of the Admiral back. This shoulder is, to begin with, less abrupt than that shown on the '134 drawing. But, in addition, it consists primarily only of thin vertical ribs separating the ventilation slots. These slots, really simply dark rectangular holes, tend to offset whatever shadows might have been created by the change in surface resulting from the shoulder. To be sure, this may not be of monumental significance but it is demonstrative of the fact that these holes affect aspects of the '134 design which plaintiff has emphasized.

Nor is it fair to contend that the extensive insertion of air vents is entirely without designing significance. Harman, the inventor of the '134 patent, was informed by the engineering department of Philco that so many square inches of air vents would be needed. It was up to him to decide what form they would take. When, after experimentation, he felt they were not pleasing enough, he sunk the horizontal ribs so the vertical ribs would appear elongated.[38] Thus, ventilation slots were a functional requirement that Harman had to fulfill before his designing task was completed. The patent itself negates the presence of such slots, even though Philco had extensively marketed its Seventeener III, with a back with air vents, for some eleven months before the patent application was filed. Comparison of the accused device must be made with the patent, not with the article marketed by the patent owner. There is no infringement under that test.

### III. The '577 Patent

The '577 patent is an apparatus patent relating to what its inventors characterize as "a novel cabinet-chassis combination, characterized by particularly advantageous structure and contour."[39]

36. N.T. 151–152, 205–207. Highlights were defined at trial as shadows resulting from changes of surface. N.T. 146.

37. DX 14 is a Philco Seventeener III back with the slots filled in. As such, it is a fair replica of the '134 drawing. The appropriate comparison can be made between this and the Admiral Thinman back.

38. DX 80, p. 280.

39. PX 3, column 1, lines 31–32.

The issue raised by the patent, in the words of counsel for Philco, "is the arrangement of the cabinet, the chassis in relation to it, and the oblique arrangement of the parts relative to the chassis and to the axis of the set."[40]

The claims of the '577 patent consist generally of a combination beginning with a television receiver cabinet shell having a depth less than its height and width. The picture tube bulb wall and the back wall of the receiver are rearwardly convex. These combine to form a concavo-convex mounting space, with a depth less than its width and height, inside the receiver. In this space is mounted a frame-like chassis consisting of top, bottom and side members which substantially frame the rear bulb wall of the picture tube. Upon these chassis members a plurality of groups of electric components are mounted at angles oblique to the axis of the tube, the cabinet shell, and themselves so as to conform to the shape of the bulb wall, back wall, and the concavo-convex space.

Even more important than what *is* in the claims, perhaps, is what *is not*. The claims do not encompass a solution of the heat problem created in compact television receivers.[41] Nor do they purport to teach proper positioning of particular components, effective circuity or solutions to other problems governing the electronic performance of television receivers. The crux of the '577 patent, as plaintiff's expert himself admitted, is the chassis configuration.[42]

a) *Validity of the '577 Patent*
1) Prior Art, Historical Background and the Development of the Seventeener III Chassis

A review of the record indicates that almost every material element of the '577 patent is well known in the prior art. Plaintiff, apparently relying on what it considers to be the new and surprising result of the combination of these elements and certain other presumptions, has not seriously challenged this proposition.

For instance, Philco's own Seventeener II, DX 11, has a peripheral cabinet shell with a maximum depth less than its height and width and a picture tube with a rearwardly convex bulb and back wall. This creates a generally concavo-convex mounting space with a depth less than its height and width. A Magnavox television receiver, DX 9, with a rearwardly convex back wall and picture tube bulb, also has a generally concavo-convex mounting space. Moreover, it has a vertical "U-shaped" bracket extending around the tube bulb and neck on which certain components are mounted so that advantage may be taken of the empty space above the rearward portion of the tube.[43] That utilization of brackets or "chassis members" so as to mount components above the rearward portion of a picture tube is well-known in the prior art is manifested by a Sylvania television receiver, DX 10. An RCA radio receiver, DX 3, has a cone-shaped loudspeaker as the dominant component.[44] The chas-

---

40. N.T. 536.

41. A co-inventor of the '577 patent testified that the heat problem in television receivers becomes more severe as the cabinet becomes smaller. DX 80, p. 405.

42. N.T. 1797.

43. Plaintiff's expert, after a spirited resistance, admitted there was a functional similarity between the bracket in DX 9, and the top member of the '577 patent. N.T. 1770. He testified, however, it did not, in his opinion, "frame" the picture tube bulb wall because it was not close enough. N.T. 1798–1799.

44. Plaintiff has asserted that a radio loudspeaker is not the equivalent of a picture tube in all respects. That is correct. But in this case the importance of the picture tube bulb wall is its general configuration, an aspect in which the RCA loudspeaker is a substantial equivalent, especially since it is cone-shaped and is the dominant component around which the other components must be mounted. The fact that a picture tube is fragile and requires more delicate handling and mounting than a radio loudspeaker is hardly relevant since it has nothing whatsoever to do with the claims of the '577 patent.

sis of this receiver has been moulded around the speaker so as to conform to its configuration. Moreover, the variable condenser and selenium rectifier have been mounted at an angle oblique to the depth of the set and to each other so as to conform to the shape of the speaker. The device of mounting individual components obliquely is, as plaintiff's expert testified, old in the art. The patent's claims, however, specify a plurality of groups of components.[45]

The configuration or form of chassis designed for use in television receivers has long been related to the length of picture tubes and the size of certain other components. On the whole, the length of picture tubes has governed the overall depth of television receivers. In the early days of television the relatively long dimensions of picture tubes allowed engineers to mount a chassis on a flat horizontal plate on the bottom of the set. As the tubes were shortened, this device was found to be unsatisfactory because it would increase the depth of the set beyond the dimensions required by the length of the tube. The components were then generally mounted on a vertical plate which surrounded the neck of the picture tube. Variations on both these themes were commonly used where necessary. The chassis might take the form of two horizontal plates, one above and one below the neck of the picture tube.[46] Or it might consist of a vertical plate mounted on the side of a set and parallel to the neck of the picture tube with other components mounted on the bottom of the set.[47] It might further be a chassis with two vertical plates facing each other.[48] In addition, the devices explained above, such as mounting components obliquely so as to conform to the shape of the picture tube, were employed so that chassis requirements would not compel the lengthening of television receivers beyond the maximum tube dimensions. Throughout this period, moreover, parallel development resulted in the miniaturization of other television components to the extent that the devices explained above could be used effectively to construct the chassis within the mounting space as determined by the length of the tube.[49]

Meanwhile, there was an industry trend, based upon public demand, for shorter and more truly portable television receivers.[50] To this end, Philco and its subsidiary, Lansdale, undertook to shorten existing 17 inch, 110° picture tubes by over 1½ inches. The record is clear it was this development which provided the impetus for Philco's Seventeener III program.[51] Philco management directed Harman and Pschick (the other co-inventor of the '577 patent) to take advantage of this new tube and to create "the thinnest-looking set you could make." [52] They were told, moreover, that the flatbed vertical chassis did not utilize the full potential of the new tube.[53]

Harman and Pschick then set about to comply with these directives from management. The parties are in dispute as to whether the overall design of the Seventeener III or the chassis configuration came first. Admiral contends the receiver design came first and Pschick did no more than fit the particular components into the mounting space avail-

45. There are two new elements in the '577 patent. First, the chassis members are closer to the rear bulb wall of the picture tube than they were in the prior art. Second, a plurality of groups of components is mounted obliquely rather than merely a group of components. If it is plaintiff's contention that these differences are sufficient to constitute invention, that contention is rejected.

46. DX 10.

47. DX 7.

48. DX 8.

49. N.T. 375, 557–558.

50. See e. g. DX 86; N.T. 1036, 1237; DX 79, p. 57; DX 81, pp. 431–434; DX 3, column 1, lines 15–25.

51. See note 29, supra.

52. See note 28, supra.

53. DX 79, 118–119, 157.

able. Philco contends, however, the record, read as a whole,[54] shows that both these elements were worked out through co-ordination and what it vaguely describes as a process of "give and take". The testimony of the inventors themselves is contradictory, for while they state it was a process of "give and take", their more specific testimony indicates the general procedure followed was for Harman to suggest a form and for Pschick to experiment and find whether there was room to mount a chassis within it. Pschick, however, would do nothing until the form had been suggested by Harman. While it is clear that the Seventeener III design, both exterior and interior, was not finalized before Pschick began work, it is equally clear Harman would propose the general form desired and Pschick would merely determine whether the mounting space was sufficient for a chassis which would perform according to the electronic standards established by management.[55] Pschick himself testified in effect that he always tried to fulfill the desires of the designers.[56]

### 2) Lack of Invention in the '577 Patent

The claims of the '577 patent have been anticipated in the prior art as to almost every material element. No single reference, however, embodies a combination of these elements. The standard for patentability of such combinations is no different from that applied to any patent. The test is still that of "invention". The courts have, however, recognized that invention is unlikely to be present in a mere combination of elements old in the art.

"The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable. * * *

* * * * * *

"Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions * * * obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men." Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152–153, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950).

The functions performed by the elements of the '577 patent are the same functions they performed in the prior art. Each and every one of them served either as a boundary governing the maximum space available for a chassis or as a device which allowed the chassis to conform to a particular mounting space. They were devices readily available to those skilled in the art who desired to conform a chassis to a particular mounting space. To say that the application of these techniques is patentable because the patent embodies the mounting space itself as a so-called co-operative element is to reduce the legal standard of pat-

---

54. It is difficult to read the deposition record in this case as a whole because much of the continuity was destroyed by repeated interruptions of counsel. This remark is not intended as a criticism of any particular attorney for it is an advocate's duty to resist objectionable questions by his adversary. Nevertheless, this was not a jury case, and a more restrained attitude would have made the task of the parties and the Court much easier.

55. DX 80, pp. 341, 360, 378–380, 384, 388–389, 392–394. It should be noted that the claims of the '577 patent do not relate to the electronic performance of the components once they are mounted in the manner shown therein.

56. DX 80, pp. 388–389.

entability below that point where some contribution to the art is required.

The '577 patent demonstrates no more than the application of old techniques to conform a chassis to a mounting space which resulted from conditions unrelated to the patent. The design possibilities created by the reduced neck of the new tube were immediately recognized by management at Philco. The same management also recognized the inadequacy of the vertical chassis as far as achieving these possibilities were concerned. The development of the chassis then proceeded with Harman suggesting particular forms and Pschick attempting, through the use of old techniques, to mount a chassis within the space available.

Plaintiff contends the '577 chassis could be used with tubes other than the short, short neck, 110° tube. This is true, but there was no corresponding need. The new tube had a shortened neck, but the bulb wall remained the same size. This created an opportunity for thinner receivers but it also left less room for mounting components. Moreover, the '577 chassis is more expensive than the vertical plate chassis because of its subassemblies.[57]

Philco has also relied upon the fact that some companies, including Admiral, have used the short, short neck, 110°, 17 inch picture tube without the '577 chassis. If this proves anything, it proves the development of that chassis was conditioned on many factors not described therein. A miniaturized tuner is necessary to utilize the '577 device with a short, short neck, 17 inch picture tube. Admiral did not approve such a tuner as meeting its performance specifications until January, 1959, over seven months after Philco began *marketing* the Seventeener III.[58] At least two of the receivers manufactured by other companies received in evidence also use a tuner larger than that employed in the Seventeener III.[59]

Plaintiff's final contention is that defendant's reliance upon 20 prior art references and its varying of the selection and manner of application of the references to fit the individual claims is persuasive of the patent's validity. The Court cannot agree. Reliance upon many prior art references which require a stretch of the imagination to find anticipation might be an indication of validity in some cases. But that would result as much from the quality of the prior art as from the quantity. The prior art here is not that weak.[60] Moreover, this patent is a combination of elements old in the art, and some quantity of prior art is necessary. Plaintiff apparently considers this its best argument,[61] but the Court finds it fraught with danger. If the number of prior art references cited by an alleged infringer is to be a test of validity, then careful preparation may be penalized and sloppy work rewarded. Moreover, reliance upon many references would seem to lead as well to an inference of invalidity as validity, for it may indicate anticipation by many devices. All the relevant prior art in patent cases should be brought forth for evaluation. If the number of references will unnecessarily lengthen the trial or is overly cumulative, a pertinent provision may be inserted

---

57. N.T. 635–638.

58. DX 51–69, N.T. 1315. The fact that models of such tuners were available earlier is not persuasive.

59. N.T. 1751–1754. These two, PX 147 and 149, were the only ones used by plaintiff to show that the '577 chassis does not necessarily result from the short, short neck tube.

60. The pertinence of the references cited, of course, varies. Nevertheless, while some are not particularly relevant to the specific claims of the '577 patent, they are helpful in providing background for the Court in the general field of chassis design.

61. Transcript of oral argument, May 12, 1961, pp. 39–40.

in the pre-trial order. But such an unreliable and illogical test is not the equivalent of the legal standard of invention.

b) *Infringement*

Infringement of the '577 patent, assuming validity *arguendo,* is conceded.

### IV. In Public Use or on Sale

35 U.S.C.A. § 102(b) provides in part,

"A person shall be entitled to a patent unless—

\* \* \* \* \* \*

"(b) the invention was \* \* \* in public use or on sale \* \* \* more than one year prior to the date of the application \* \* \*."

Philco applied for the '134 and '577 patents on May 11, 1959, after this action had begun. It is defendant's contention that certain transactions between plaintiff and the Firestone Tire and Rubber Co. which occurred before the cutoff date of May 10, 1958, bring that statutory provision into play.

The record indicates that there is a continuing and established business relationship between Philco and Firestone.[62] Firestone is a regular and substantial customer of Philco's and sells Philco products exclusively in the electronics field. Firestone is not, however, part of Philco's regular field system but has its own sales organization. Because Firestone announces and introduces Philco products at about the same time as Philco introduces them to its own distributors and dealers, advance information and advance arrangements are necessary.

Consequently, it is customary for the second echelon of Firestone management to come to Philco and view the new line of products two or three months prior to Philco's announcement. Pictures of the new line are then taken back to top management at Firestone and thereafter forwarded to the district managers who order the number they require on the basis of the pictures.

In 1958, however, Philco's concern over maintaining secrecy as to the Seventeener III and the Predicta line caused a change in these procedures. It would not allow pictures to be taken back to Firestone, and, as a result, both second echelon and top management at Firestone came to Philco in March, 1958. At that time, Philco had several completely operative but hand-made Seventeener III's which were going through certain final tests.[63] No production runs had yet been made. The showing to the Firestone representatives was made with mock-ups of the Seventeener III which represented the design but would not perform electronically. The Firestone people were told that no sets would be produced or available until June, 1958 and that final prices had not been established. Nevertheless, Philco gave Firestone an estimated price range on the Seventeener III. As a result of this meeting, Firestone, through certain documents entitled "releases", indicated the quantities they wanted delivered when the sets were available. This was accomplished before May 10. In June, prices were established, and, on June 18, Firestone sent a document entitled a "purchase order" to Philco. This was not strictly a purchase order, however, for it specified no quantities. In effect, it finalized the price, the quantities to be governed by releases previously delivered and others to be sent in the future.

The general purport of the testimony was to the effect that Firestone was not legally bound until both a "release" and a "purchase order" had been sent.

---

62. There is actually little disagreement between the parties as to the relevant facts, although there is a sharp dispute as to the inferences and legal conclusions to be drawn therefrom.

63. Among these tests were so-called "drop tests", designated to insure that the model will not be damaged during shipment.

Nevertheless, it is apparent that the relations between Philco and Firestone were not wholly governed by such considerations. In this case, what would seem to be the normal business pattern was reversed, and the "releases" sent before final prices were established by the "purchase order". Philco governed its production in accordance with the quantities specified in the releases and, indeed, shipped to Firestone upon an oral request before the "purchase order" was received. To be sure, Firestone might have had the right to change or eliminate certain orders reflected in the releases. Nevertheless, neither party treated the early showings or resultant "releases" frivolously, and each expected good faith behavior on the part of the other. Firestone and Philco wanted both flexibility and reliability, and they achieved this through a relationship which did not depend upon purely legal considerations. Philco's own testimony reflects this clearly. The March meeting was regarded at Philco as a sales meeting, the purpose of which was to sell Philco's new line to Firestone.[64] Moreover, the testimony of Philco's Vice President of Marketing, Bowes, shows he considered the "releases" the equivalent of a purchase for his purposes.[65] Firestone, on the other hand, was relying on Philco's good faith as to the estimated price range and electronic performance.[66]

The cases dealing with § 102(b) of the Patent Act are in a state of confusion resulting in part from an attempt to establish hard and fast rules of law based upon overly refined legal distinctions. The area sought to be governed by these rules, however, encompasses an infinite variety of factual situations which, when viewed in terms of the policies underlying § 102(b), present an infinite variety of legal problems wholly unsuited to mechanically-applied, technical rules. The "in public use or on sale" rules as applied to the independent craftsman who constructs a product to order, for instance, may lead to an absurd result when applied to an integrated, mass production industry with highly organized merchandising systems. The question of what is experimentation and what is not may also take on a different complexion depending on the character of the device, the nature of the industry, and the facilities available to the particular inventor.

It is clear that an experimental use (whatever that may be) of a subsequently patented device is not within the statute. Smith & Griggs Mfg. Co. v. Sprague, 123 U.S. 249, 8 S.Ct. 122, 31 L.Ed. 141 (1887). The record in this case is clear, however, that the Firestone showings were not for an experimental purpose, and the Court does not understand plaintiff to challenge that proposition.

Many cases have stated that an actual sale is not necessary to bring the statute into play, an offer to sell being sufficient.[67] See e. g. Wende v. Horine, 225 F. 501 (7 Cir. 1915); Megee v. The Coca-Cola Co., 232 F.2d 596 (7 Cir. 1956); Chicopee Mfg. Corp. v. Columbus Fiber Mills Co., Inc., 165 F.Supp. 307 (D.C.M. D.Ga.1958). In these cases, the fact that the goods sold had to be manufactured subsequently was of no significance.

---

64. N.T. 1618.

65. "Well, they gave us a purchase order, group of purchase orders, to be delivered when the sets were available at whatever the price was when we priced them." DX 83, pp. 1058–1059. This witness' deposition clearly demonstrates that he believed the March meetings were a sales effort and that sales resulted at the time. Indeed, he used the words "bought" and "sold" so often he was brought back to testify at trial that no "sales" resulted. His later testimony is, in the Court's mind, less credible than the first, and was, in any case, based upon purely legal considerations.

66. DX 83, p. 1060.

67. This complies with the language of § 102(b), for it merely requires that the device be "on sale", not "sold".

Other cases, however, beginning with Mc-Creery Engineering Co. v. Massachusetts Fan Co., 195 F. 498 (1 Cir. 1912) state that the device must be in being and ready for delivery to be "on sale". In that case, the inventor signed a contract before the statutory bar date to construct his subsequently patented machine and deliver it after the bar date. But not one model had been built and the plans accompanying the contract represented the conception of the invention. Burke Electric Co. v. Independent Pneumatic Tool Co., 232 F. 145 (2 Cir. 1916) followed McCreery's broad language. In that case the inventor signed a contract to sell his subsequently patented motor subject to approval of a sample delivered after the bar date. Finding the sample was determinative of the contractual obligations of each party, the transaction was held not to be within the statute. In a later decision in the same case, 234 F. 93 (2 Cir. 1916), it was said the "sale contemplated is such as creates an opportunity for present public use." [68] The Court further stated that "reduction to practice" is not important in terms of § 102 (b), and that the goods must be ready to be delivered to any purchaser to be "on sale". In B. F. Sturtevant Co. v. Massachusetts Hair & Felt Co., 124 F.2d 95 (1 Cir. 1941), the critical date was held to be when the order is filled, not when it is placed. That case involved the construction of a "tailor-made" device.

Another line of cases, primarily involving the "public use" part of § 102(b), has emphasized the underlying policies of that statutory provision. In Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co., 153 F.2d 516 (2 Cir. 1946), the question was whether the sale of a product made from a secret and subsequently patented process was a prior use. The finished product itself did not reveal the process. Judge Learned Hand held that an inventor cannot be allowed to use his device competitively more than one year prior to his patent application no matter how little the public learns of the invention.[69] It was reasoned that such a competitive use prior to a patent application is the effective equivalent of an extension of the patent monopoly. This rule has been adopted in the Third Circuit. United States Chemical Corp. v. Plastic Glass Corp., 243 F.2d 892 (3 Cir. 1957).

■ There is no persuasive reason why the policy delineated so cogently in Metallizing Engineering Co., supra, does not apply to the "on sale" portion of § 102(b) and invalidates the '134 and '577 patents. The March showing to Firestone was clearly a competitive use of the Seventeener III and the patents embodied therein. It was a sales effort, Philco's purpose being to sell the Firestone representatives on the new line and to persuade them to buy it.[70] Firestone is in a class by itself as a customer of Philco's.[71] One of the things Philco must do to retain Firestone's trade and to prevent its competitors from taking it over is to hold these showings so that Firestone can make early arrangements as to its purchases. This was clearly a competitive use of the Seventeener III and would, if allowed, result in an extension of the patent monopoly.

Plaintiff's emphasis upon the tentativeness of the arrangement is misplaced. To be sure, Firestone might in good faith change some of its orders, but the quantities specified were substantially reliable, a factor underlined by Philco's reliance upon the "releases" not only in governing its production but also in shipping before a "purchase order" was received. Firestone sells Philco products exclusively in the electronics field. The March

---

68. 234 F. 93.

69. The Court believes that this holding effectively overruled the broad language in the Burke decision indicating a sale must create an opportunity for a present public use. See note 68, supra, and accompanying text.

70. See notes 65-66, supra.

71. DX 81, p. 567.

showing was held to display Philco's new line and to get reliable estimates of Firestone's needs. That is placing the new line "on sale".

Nor is the lack of production models of the Seventeener III in March persuasive. On March 27, Philco was only about two months away from production. Firestone was relying upon Philco's past performance as far as electronic standards were concerned. The matter relevant to the claims of the patents was settled, and Philco knew almost exactly what it was going to sell in June. The requirement of existing production models laid down in the McCreery case is inapposite here. This is not, as it was in McCreery, a situation where the invention was conceived almost simultaneously with the signing of the contract, or a situation, as in Burke, where a "sample" contract is executed and neither party may know exactly what the finished article will be like.[72] In those cases, neither the inventor nor the prospective buyer could be sure of the character of the finished product as a practical matter, simply because nothing approaching a working or finished model had been achieved. In such a situation, a holding that a subsequently patented device is not "on sale" is not unreasonable. At the time of the alleged sale, the inventor himself may be uncertain as to the ingenuity or usefulness of his untested device. In the present case, however, no such circumstances exist. This is not a case of an invention stumbled upon because of the needs of a particular customer or of a contract signed shortly after a device has been conceived and no more. The Seventeener III is a mass production, consumer item. A particular

merchandising problem led Philco to hold the March showing, an event which would not have taken place were there any uncertainty on Philco's part as to the character of the production model. Under those circumstances, the danger of allowing an unwarranted extension of the patent monopoly is far greater than it is in factual situations like McCreery. If there was uncertainty in this case, it was on the part of Firestone, not Philco, but it had Philco's past performance to rely upon.

In any case, the Court believes that it is the intent of the patentee or inventor rather than the tentativeness of the prospective buyer which is the key. As one court has said:

"True, some sales were conditional; that is to say, the stoves were to be returned if they were not satisfactory to the buyers; but this does not, without further explanation, prove that they were experimental. It may show that the purchaser had doubts about the article, but does not prove any on the part of the seller." Henry v. The Francestown Soap-Stone Co., 2 F. 78, 80 (D.C. N.H.1880).

The words "on sale" themselves imply that the intent of the inventor is the critical factor. It is a question of fact to be determined upon all the evidence and in light of all the circumstances of the case. The words "on sale" themselves are not so complex as to compel overly-refined distinctions which ignore the infinite variety of commercial practices. In this case, it is clear Philco was trying to sell its new line to Firestone. This was a

---

72. The Burke decision is unclear as to what stage the invention was in when the contract was executed, although the fact that the sample was to be delivered later would seem to indicate that much uncertainty still surrounded it. The Court would agree with the broad language in Burke to the effect that the term "reduction to practice", in a strictly legal sense, is not relevant to the "on sale" issue. It does not believe, however, this proposition leads inevitably to the conclusion that production models must be in existence. What is required is that the inventor have some degree of certainty as to the nature and usefulness of the finished product. This must be determined in light of the circumstances of each case. In the present case, Philco had little, if any, uncertainty as to the character of the production model of the Seventeener III.

competitive use. As such, a failure to invalidate the '134 and '577 patents, assuming they are otherwise valid, would lead to an unwarranted extension of the patent monopoly.

### V. Various Presumptions and Evidentiary Standards Relied upon by Plaintiff

Plaintiff has relied heavily upon certain presumptions and evidentiary standards to support the patents in suit. Even assuming their applicability to the facts of this case, the Court does not believe any one or all of them together is sufficient to overcome what has been said in the body of this opinion. Nevertheless, the emphasis placed upon them by plaintiff compels some comment by the Court.

#### a) *Statutory Presumption of Validity*

35 U.S.C.A. § 282 states in part, "A patent shall be presumed valid." This presumption applies to design as well as apparatus patents. The parties are in much dispute as to the weight of this presumption, especially where the examiner has not cited particular prior art as a reference on the face of the patent. These questions need not be determined, however, for all parties agree it is a rebuttable presumption. The Court finds it has been rebutted under any standard of burden of proof.

#### b) *Commercial Success of the Seventeener III*

Philco has relied heavily upon the commercial success of the Seventeener III. The Supreme Court has clearly held such evidence cannot save a patent when invention is plainly lacking and that it is really only a makeweight where the issue of patentability is close. Jungersen v. Ostby & Barton Co., 335 U.S. 560, 69 S.Ct. 269, 93 L.Ed. 235 (1949). Clearly this must be so, for it is the effort of the inventor, not the whim of the consumer or the diligence of the advertiser which the patent laws seek to encourage and protect. To be sure, commercial success may be indicative of the satisfaction of a long-felt need, but it can be a very unreliable barometer of invention. The present case demonstrates that clearly.

The record is clear to the effect that the stimulus for the public's ready acceptance of Philco's Seventeener III was its ostensible thinness. But there is no causal relationship between that thinness and the patents before the Court. It is a result of the *combination* of the '692 and '134 designs. This cannot support the validity of either patent taken individually, for the '692 patent, when used with a different back, or the '134 patent, when used with different front and side treatment, might not have any commercial success at all. Under Philco's theory of this case, however, an infringement suit would lie against anyone using either patent, regardless of what other design was combined with it.

Even assuming Philco had patented the design concepts embodied in the Seventeener III as a whole, a causal relationship between the satisfaction of a long-felt need and the claims of the patents in issue is lacking. The design and chassis configuration of the Seventeener III were more the result of all around technological development in the television industry than invention as reflected in the claims of the patents in issue. The feasibility of the short, short neck, 17 inch, 110° picture tube provided an opportunity which Philco management immediately recognized. The miniaturization of other components, such as the tuner, was also a prerequisite to the creation of the Seventeener III. To speak in terms of a satisfaction of a long-felt need by the patents now before the Court would ignore the fact that the patents themselves do not purport to cover the developments which rendered the satisfaction possible.

Even assuming, therefore, this is a close case on the patentability issue, which it is not, commercial success of the Seventeener III receiver cannot support the validity of these patents.

c) *Derivation of the Thinman Receiver*

 Plaintiff has made much of the fact that the basis for the Admiral Thinman receiver was the Philco Seventeener III. It suffices to state the record is persuasive of the fact that the Thinman was developed from the Seventeener III. Plaintiff relies heavily on this to support the validity of its patents. But again, the reliability of such a test is very poor. Mason, at one time a designer for Admiral, had once created a design for a portable television set quite similar to the Seventeener III, DX 34(b).[73] But at the time it was technologically impossible to produce such a receiver. To be sure, this does not relieve Admiral from whatever moral stigma may attach to a lack of originality, but it clearly goes to Philco's argument that copying by Admiral shows invention in Philco's patents. Copying can be important in terms of invention only when it demonstrates the patentee exercised skill beyond that exercised by the ordinary person skilled in the art. But when the one who copies conceived the general idea underlying the claims of the patent some years earlier, the copying is hardly reliable evidence of the presence of invention.

Moreover, the record shows Admiral was technologically behind Philco in areas not covered by the patents but critical to the development of the sets in question. Philco and its subsidiary, Lansdale Tube, were aware of the feasibility and dimensions of the new tube shortly after the middle of 1956.[74] Admiral had the same information about 10 months later. Admiral's engineering department did not approve a miniaturized tuner until 7 months after Philco announced and marketed the complete Seventeener III.[75] Under these circumstances, Admiral's use of Philco's receiver as a basis for the development of its own set is of little probative value.

d) *The Standard of Invention*

Invention is still the prerequisite for patentability. Unreliable, and often wholly misleading tests, such as counting the number of prior art references cited by a defendant, commercial success, or copying cannot compel an abdication of judicial responsibility in patent cases. To be sure, the elusiveness of the standard of invention creates many difficulties when it is sought to be applied to the facts of a particular case. But that is not justification for resorting to the easy solutions offered by the tests pressed so hard by plaintiff. Counting the number of prior art references cited by a defendant may well be an easy test to apply, but it can hardly be contended that it has any relationship to the purposes of the patent laws. Copying by one defendant, while it may create sympathy for the patentee, may be equally unreliable as a test of validity, for valid patents can be enforced against those who copy and also those who create on their own. Likewise, commercial success of a complete article developed through a company-wide program does not necessarily reflect invention in the contribution made by one or two individuals who were only a part of this program. The fact that a particular standard would make the task of a judge an easy one is not grounds for its incorporation into the law. The standard for patentability is invention. This is to be determined upon all the evidence, and these tests are to be given weight commensurate with their relation to the issue of invention. In this case, the evidence taken as a whole shows the patents in suit are clearly invalid.

The foregoing opinion is adopted as the Court's findings of fact and conclu-

73. Because three-dimensional models of these designs were not made, defendant does not rely upon them as prior art. It does, however, contend their existence demonstrates the obviousness of the designs in question once the technological problems had been solved.

74. See e. g. DX 79, p. 71.

75. Prior to this approval, Admiral manufactured its own tuner which was too large for use in receivers such as those under consideration now.

820

sions of law pursuant to F.R.Civ.P. 52 (a), 28 U.S.C.A.

Let an appropriate order in conformity herewith be submitted

# United States Patent Office

Des. 183,692
Patented Oct. 14, 1958

183,692

### PORTABLE TELEVISION RECEIVER

Emil I. Harman, Philadelphia, Pa., assignor to Philco Corporation, Philadelphia, Pa., a corporation of Pennsylvania

Application November 19, 1957, Serial No. 48,548

Term of patent 14 years

(Cl. D56—4)

The figure is a front perspective view of a portable television receiver showing my new design.

The side of the portable television receiver not shown is substantially the same in appearance as the side shown and the back is unornamented.

I claim:

The ornamental design for a portable television receiver, substantially as shown and described.

References Cited in the file of this patent

UNITED STATES PATENTS

| | | |
|---|---|---|
| D. 148,324 | Portanova | Jan. 6, 1948 |
| D. 152,156 | Jenks | Dec. 21, 1948 |
| D. 159,161 | Painter | June 27, 1950 |
| D. 179,857 | Mason | Mar. 12, 1957 |

Appendix "A"

# United States Patent Office

**Des. 186,134**
**Patented Sept. 15, 1959**

186,134

## BACK PANEL FOR A PORTABLE TELEVISION RECEIVER

Emil I. Harman, Philadelphia, Pa., assignor to Philco Corporation, Philadelphia, Pa., a corporation of Pennsylvania

Application May 11, 1959, Serial No. 55,870

Term of patent 14 years

(Cl. D56—4)

FIG. 2.

FIG. 1.

Figure 1 is a perspective view of a back panel for a portable television receiver as it appears when in use, a portable television set being shown in broken lines for conveniece of illustration; and

Figure 2 is a side elevational view of the back panel shown in Figure 1, the sides not shown being substantially the same in appearance

I claim:

The ornamental design for a back panel for a portable television receiver, substantially as shown and described.

References Cited in the file of this patent

UNITED STATES PATENTS

| | | |
|---|---|---|
| 2,642,566 | Regnier | June 16, 1953 |
| 2,696,609 | Seever | Dec. 7, 1954 |
| 2,719,292 | Junkin | Sept. 17, 1955 |

OTHER REFERENCES

Industrial Design, June 1958, page 52.

Appendix "B"