The CARBORUNDUM COMPANY, Plaintiff,

v.

COMBUSTION ENGINEERING, INC., Defendant.

Civ. A. No. 76–139.

United States District Court, D. Delaware.

Jan. 22, 1981.

Douglas E. Whitney of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., and William H. Webb, Russell D. Orkin and William H. Holt of Webb, Burden, Robinson & Webb, P. A., Pittsburgh, Pa., of counsel, for plaintiff.

Daniel F. Lindley of Potter, Anderson & Corroon, Wilmington, Del., and Richard H. Berneike and Lombro J. Ristas, Windsor, Conn., of counsel, for defendant.

## OPINION

LATCHUM, Chief Judge.

This patent suit was brought by the plaintiff, the Carborundum Company ("Carborundum"), against defendant, Combustion Engineering, Inc. ("C–E"), for alleged infringement of United States Patent No. 3,624,344 ("the Kutzer patent") entitled "Attachment of Nonmetallic Articles To Metallic Substrates" issued November 30, 1971 to Louis G. Kutzer and assigned to plaintiff. Carborundum seeks a judgment that the Kutzer patent is valid and that Claims 1 to 5, inclusive, and 7 have been infringed directly and contributorily by C–E and that C–E has induced others to infringe. Plaintiff seeks an injunction and treble damages because of the alleged willful and deliberate nature of C–E's infringement. (D.I. 1 & 69.) [1]

C–E has denied infringement and asserted the affirmative defenses that the Kutzer patent is invalid for failure to comply with the requirements of 35 U.S.C. §§ 102(b), 103 and 112. Specifically, C–E charges invalidity on the grounds that the subject matter was on sale in this country more than one year prior to the date of filing the application for the Kutzer patent (§ 102(b)), that the subject matter claimed, as a whole, would have been obvious to one of ordinary skill in the art when Kutzer made his invention (§ 103), and that the claims fail to point out and distinctly claim the invention (§ 112). In addition, C–E has counterclaimed seeking a declaratory judgment that the Kutzer patent is invalid and not

---

1. References to "D.I." are to the Court's Docket Items; the plaintiff's and defendant's exhibits are referred to as "PX" and "DX" respectively; and the trial transcript as "R".

infringed by C–E, an injunction against Carborundum from charging infringement against C–E and those in privity with it, and an award of costs and expenses including attorney fees. (D.I. 6 & 69.)

Jurisdiction exists by virtue of 28 U.S.C. § 1338(a) and venue is properly laid under 28 U.S.C. § 1400(b).[2]

Following trial to the Court, the issues were thoroughly briefed by counsel and the case is now ready for decision.

## I. THE KUTZER PATENT

The Kutzer patent relates to the attachment of replaceable ceramic liners to metal surfaces, such as conduits, storage bins, conveyors, etc., as a protective shield to the underlying metal surfaces against wear by abrasion or corrosive materials. (PX 1, Col. 1, *l.* 8, 11–12; R 53–54.)

Prior to the Kutzer patent, several well-known, old and different attachment techniques were in use for attaching ceramic linings to a metallic base, such as the use of (a) ordinary bolts and nuts, (b) T-stud welding in which the T-shaped stud was welded to the underlying metal surface and a slotted ceramic segment was placed under the flange portion of the stud, and (c) various types of adhesives, including epoxy. (R 25–26; PX 9, pp. 14–22; DX 19, p. 5.)

Mr. Kutzer, an application engineer for Carborundum's Durafrax Wear Alumina products at plaintiff's Latrobe, Pa. plant, conceived the idea for his invention on September 27, 1965 as a more satisfactory method of attaching wear and abrasion resistant materials manufactured by Carborundum to various substrates. (DX 19, pp. 2, 3, 5–6.) In his idea memorandum (DX 1), Mr. Kutzer described his invention:

> The non-metallic material is provided with tapered holes at suitable locations depending on the particular installation and specific requirements. These holes are of a configuration to match or mate with hollow conical weldable retainers in such a fashion that after welding the non-metallic material is held in positions adjacent to the structure to which it is attached.

The idea conceived by Mr. Kutzer was not disclosed to Carborundum's Patent Department until April 20, 1967 and the first of the two patent applications was not filed until August 2, 1968. (DX 1; DX 69, ¶ 21; DX 10, p. 7.)

The Kutzer patent that finally issued on November 30, 1971 was on application Serial No. 33,935, filed May 1, 1970; the latter application was a continuation-in-part of application Serial No. 749,833, filed August 2, 1968. (PX 1, 2 & 3.) The issued patent includes seven claims. Claims 1–6 are directed to the attachment combination of the nonmetallic or ceramic lining, the metal substrate, the metallic retainer and the weld bead. Claim 7 is directed to the method of installing the lining on an underlying metallic surface. Only Claims 1–5 and Claim 7 are asserted against C–E.

Claim 1 is the only independent claim directed to the attachment combination. It reads as follows:

> In combination, an underlying metal surface; a nonmetallic article superimposed on said underlying surface, said article having a face adjacent said underlying surface and a face opposite thereto and having a socket portion extending from one of said faces to the other, the periphery of said socket portion being arced in cross section and at least a portion thereof being of decreasing radius as it approaches the first-mentioned face of said article; a metallic retainer having a frustoconical outer surface with a slope approximately the same as that of said socket portion, within and closely fitting the portion of said socket portion having the decreasing radius, said retainer having a passage therethrough coaxial with said frustoconical surface and an annular, inwardly directed flange projecting into said passage adjacent the smaller end of said retainer; and a weld bead securing together said underlying surface and said retainer and extending into said passage beyond said flange, whereby said retainer is held close to but spaced from said

2. C–E is a Delaware corporation.

underlying surface and said nonmetallic article is firmly retained on said underlying surface.

The balance of the combination claims (1–5) are written in dependent form which means they contain all the limitations of the claims upon which they depend.

Specifically, Claim 2 is dependent on Claim 1 and specifies that the nonmetallic article is ceramic. Claim 3 is dependent on Claim 2 and specifies that the retainer has a length shorter than the thickness of the ceramic article. Claim 4 adds a cover to the combination of Claim 3 and specifies that the cover is positioned in the upper portion of the socket. Claim 5 requires the cover of Claim 4 to be of the same material as the ceramic article.

Claim 7 is an independent claim directed to a method of installing a nonmetallic article on the metallic surface. It reads as follows:

A method of installing a nonmetallic article on an underlying metallic surface, said article having a face adjacent said underlying surface and a face opposite thereto and having a socket portion extending from one of said sides to the other, the periphery of said socket portion being arced in cross section and at least a portion thereof being of decreasing radius as it approaches the first-mentioned face of said article, which comprises fitting a metallic retainer in said socket portion of decreasing radius, said retainer having a frustoconical outer surface with a slope approximately the same as that of said socket portion and having a passage therethrough coaxial with said frustoconical surface and an annular, inwardly directed flange projecting into said passage adjacent the smaller end of said retainer, inserting a welding rod through said passage to said underlying surface, and depositing a weld bead on said underlying surface and into said passage above said flange.

## II. C–E's ACTIVITIES CHARGED TO INFRINGE

In 1974, C–E began production of abrasion resistant ceramic-type refractories. This product was introduced for applications in which a metal surface or substrate was to be protected by the abrasion resistant ceramic tile. (PX 9, p. 11.) Initially, the ceramic tile was attached to the metal substrate by (a) conventional nuts and bolts, (b) ramset studs and bolts, (c) welded T-studs, or (d) epoxy. (D.I. 69, ¶ 17; PX 9, pp. 14–16.)

As a direct result of a request to C–E by the Algoma Steel Company of Canada and an examination in 1974 by C–E's employees of an installation at Algoma Steel of Carborundum's abrasion resistant tile secured by conical weld plugs or retainers, C–E modified its tile design to have sockets for receiving conical weld plugs and introduced the tile along with conical weld plugs into the U. S. market. (D.I. 69, ¶ 19.)

More specifically, C–E was attempting to sell Algoma in Canada the C–E abrasion resistant tile for use as a skirt board to protect a coke conveyor. Wortley B. Paul, the Vice President of Marketing and sales of the Technical Refractories group, called on Algoma and Algoma showed him a Carborundum installation and asked him to supply such an attachment means. (PX 9, pp. 3, 23–26.)

Algoma even relieved C–E of any responsibility of proving the capability of the retainer to hold the tile in place since Algoma was completely satisfied with the Carborundum type attachment. (PX 9, pp. 24–28.) Algoma personnel told Mr. Paul, " 'Your tile is fine. It withstands the abrasion perfectly'—or satisfactorily—'but we can't get it to stay in place with the type of anchor that you are using. Use this one. It works better and we are buying your tile.' " (PX 9, pp. 27–28.) The "this one" referred to the weld plug type of attachment that had been supplied by Carborundum. (PX 9, p. 28.)

The allegedly infringing C–E tile produced in response to Algoma's request has a socket therethrough which is arced in cross section and at least a portion of it is of decreasing radius. (D.I. 69, ¶ 10.) The re-

tainers are metallic and have a frustoconical outer surface with a slope approximately the same as the socket portion of the tile. (D.I. 69, ¶ 10.) The retainers have a passage therethrough which is frustoconical and coaxial with the frustoconical outer surface. (D.I. 69, ¶ 11.) The passage through the retainer of C–E is frustoconical from one end to the other and does not have any structure projecting from it into the passageway. (R 89, 96, 150–51, 153.) Certain of the retainers are shorter in length than the thickness of the ceramic tile and a cover of the same material as the ceramic is provided for the upper portion of the socket. (D.I. 69, ¶ 12.) C–E recommends that a layer of adhesive be placed between the tile and the metallic surface. (D.I. 69, ¶ 13; PX 26, PX 31.) The weld bead in the C–E product is fused to the surface of the metal plate and extends into the retainer passage beyond the bottom end of the retainer and is fused to the retainer wall and, as a result, the retainer is rigidly secured to the metal plate. (R 228, 274–75.)

## III. THE INFRINGEMENT ISSUE

Approximately three years after Mr. Kutzer conceived his invention, a patent application was filed on August 2, 1968. (PX 2.) Kutzer presented 11 claims divided into three groups. Independent Claim 1 and dependent Claims 2–4 related to an attachment comprising a retainer and the segment to be attached. Independent Claim 5 and dependent Claims 6–9 related to a combination comprising a metal surface, a segment, a retainer, and a weld. Independent Claim 10 and dependent Claim 11 related to a method of installing wear segments on a metal surface. Only Claim 9 limited the composition of the segment. (PX 2, pp. 12–14.)

None of the claims as originally filed called for a space between the retainer and

the underlying metal surface and only dependent Claim 3 called for an "inwardly projecting flange in said passage" of the retainer. All other claims were broad enough to cover retainers having any internal configurations so long as a passage was provided.

In the Patent Office Action mailed June 26, 1969 (PX 2, pp. 18–21), all the original claims were rejected as being obvious in view of the combined teachings of the U. S. patents to Hutchison [3] (PX 5) and Fromm [4] et al. (PX 7). The U. S. patents to Rapasky [5] (PX 4) and Rood [6] et al. (PX 6) were not applied against the claims but were cited as pertinent to the teaching of joining two surfaces by welding a retainer to one. By amendment filed September 17, 1969 (PX 2, pp. 22–28), Kutzer added detailed limitations to most of the claims, limited the segment to a nonmetallic material, and added Claim 12 which further modified Claim 3 by requiring that the retainer be "recessed with respect to the surface of the non-metallic article adjacent the underlying surface." Thus, at this stage, the limitation of the projecting flange appeared only in Claims 3 and 12, and the limitation of the space below the retainer appeared only in Claim 12.

All claims were finally rejected in the Patent Office Action mailed December 5, 1969 (PX 2, pp. 29–32), as being obvious in view of Hutchison (PX 5) and the newly cited British patent to Cyc-Arc [7] (PX 8), or in view of these patents as modified by Fromm (PX 7). By amendment filed February 25, 1970 (PX 2, pp. 33–40), Kutzer amended all the claims to require the retainer to have an "inwardly projecting flange within the end of the passage intended for attachment to the metal surface." In the accompanying remarks, the following arguments were advanced:

**3.** Hutchison—U. S. Patent No. 2,986,244, issued May 30, 1961.

**4.** Fromm—U. S. Patent No. 3,204,083, issued August 31, 1965.

**5.** Rapasky—U. S. Patent No. 2,860,230, issued November 11, 1958.

**6.** Rood—U. S. Patent No. 3,095,951, issued July 2, 1963.

**7.** Cyc-Arc—British Patent Specification No. 649,177, published January 17, 1951.

It is believed that the claims as amended properly define applicant's invention in view of the prior art.
(PX 2, p. 36.)

\*     \*     \*     \*     \*     \*

Claims 1, 2 and 5–9 have been rejected under 35 U.S.C. § 103 as unpatentable over Hutchison in view of the newly-cited British patent 649,177. These claims have all been amended directly or by reference, to recite the preferred feature of Claim 3, namely, an inwardly projecting flange which is welded to the underlying metal surface.
(PX 2, p. 36.)

\*     \*     \*     \*     \*     \*

—Regarding the rejection based on the welded flange disclosed in Fromm (PX–7):
. . . there is no suggestion that the flange be incorporated in the retainer of Hutchison. Granted such a modification of the Hutchison retainer could be accomplished, but to do so would be completely unobvious as it would totally defeat the purpose of Hutchison, . . .
(PX 2, p. 38, *ll.* 20–24.)

\*     \*     \*     \*     \*     \*

—Since Kutzer's invention would be unworkable if the entire retainer bottom became fused to the metal substrate, the claims were amended to clearly indicate that the flange is welded, not the entire bottom.
(PX 2, p. 38, *ll.* 10–15.)

\*     \*     \*     \*     \*     \*

The various features of the applicant's invention are, for the most part, old in the art.
(PX 2, p. 40.)

\*     \*     \*     \*     \*     \*

—The prior art does not show attachments having the following combination of advantages: simplicity, a homogenous surface, and *most important* (emphasis added) easy replacement.
(PX 2, p. 736, *ll.* 10–16.)

The amendment filed February 26, 1970 was not entered by the examiner because "they raise new issues that would require further consideration and/or search" (PX 2, p. 41), so Kutzer filed a continuation-in-part application on May 1, 1970. (PX 3.) Several editorial changes in the description of the invention were made, and the claims were re-worded to the language essentially appearing in the patent as issued. It is noted that no claims relating to the original Claims 1–4 as broadly drawn to an attachment comprising only a retainer and a segment to be attached, remained in the application. Only the combination and method claims (as amended) were filed in the continuing application.

All claims were again rejected on the basis of Cyc-Arc patent (PX 8), in view of Fromm et al. (PX 7) and Hutchison (PX 5). (PX 3, pp. 20–22.) Mr. Kutzer, through his patent solicitor, then had an interview with the examiner. The only record of the interview is provided by comments filed by Kutzer along with an argument which presumably reflects the reasons why the examiner finally allowed the claims. (PX 3, pp. 25–27.) The argument proceeds as follows: Cyc-Arc (PX 8) and Hutchison (PX 5) both show shanked fasteners.

> [I]t does not appear obvious to modify the shanked fastener of the British Patent [PX–8] by substituting a construction from Hutchison [PX–5], who shows another shanked fastener, and then to throw away the concept of shanked fasteners by using a weld bead as allegedly suggested by Fromm et al. [PX–7].

(PX 3, pp. 25–26.)

The Patent and Trademark Office, according to its normal procedure, renumbered the allowed claims. Thus, the issued claim numbers do not correspond with the claim numbers referred to during prosecution of the application. The claims which issued to Kutzer and are the subject of this law suit, as previously mentioned, are of two types. Claims 1–6 are drawn to a combination and Claim 7 is drawn to a method. It is uncontroverted that C–E never has made, used, or sold ceramic tile which had corners adapted to form a frusto-

conical socket when a plurality of tiles were placed side by side. (R 108.) Accordingly, plaintiff has stated that Claim 6, which is drawn to a combination having such tiles, is not asserted against C–E. (D.I. 77, p. 10.)

All claims require four basic components: a nonmetallic or ceramic article having a socket; an underlying metal surface; a metallic retainer having a passage therethrough and located in the socket; and a weld bead securing the retainer to the underlying surface. More specifically, all claims require that the retainer have, "an annular, inwardly directed flange projecting into said passage adjacent the smaller end of said retainer." (PX 1, Col. 4, l. 57.) Claims 1–6 include a functional limitation, "whereby said retainer is held close to but spaced from said underlying surface . . . ." (PX 1, Col. 4, l. 30.)

The question to be determined here is what, if anything, did Kutzer surrender when he narrowed the independent claims to incorporate the limitation of Claim 3 wherein the retainer includes an inwardly projecting flange in the end of the passage intended for attachment to the metal surface.

Carborundum argues that the originally presented Claims 1 and 2 (PX 2, p. 8) indicated that the frustoconical inner walls of the retainers were "shoulders" and that shoulders were tantamount to "flanges." C–E, on the other hand, argues that the broad claims of 1 & 2 of the original patent were limited and narrowed during prosecution to require a "flange projecting into the passage." The Court finds that C–E's contention has merit.

The independent claims in the application prior to the amendment of February 26, 1970 (PX 2, pp. 33–40), called for a hollow metallic retainer having outer side walls adapted to mate with the side walls of a socket in the member to be attached, but did not specify the shape of the inner walls defining the passageway of the retainer. Thus, a cylindrical passage fell within the scope of the claims, as did a frustoconical passage, or a passage with projecting structure as illustrated in Figures 3, 4, 7 and 8 of

the Kutzer patent. Dependent Claim 3 defined a specific embodiment of the invention wherein the retainer had an inwardly projecting flange in the end of the passage intended for attachment to the metal surface. (PX 2, p. 23.) The concept of claim differentiation states that claims should be presumed to cover different inventions. This means that interpretation of the claims should be avoided if it would make one claim read like another. *Autogiro Company of America v. United States*, 384 F.2d 391, 404 (Ct.Cl.1967). Therefore Claim 3, which included the flange, covered a different invention from any of the independent claims.

Kutzer specifically stated in the amendment filed February 26, 1970, wherein the broadest claims were narrowed to include an inwardly projecting flange, that "it is believed that the claims as amended properly define applicant's invention in view of the prior art." (PX 2, p. 36.)

Unquestionably that amendment was intended to distinguish the claimed invention over the cited prior art. On page 36 of PX 2, the newly cited British patent was recognized and Kutzer specifically stated that the amendment to the claims was intended to overcome this reference as combined with the previous reference. In a two-sentence paragraph, Kutzer stated:

Claims 1, 2, and 5–9 have been rejected under 35 U.S.C. § 103 as unpatentable over Hutchison in view of the newly cited British patent 649,177. These claims have all been amended directly or by reference, to recite the preferred feature of Claim 3, namely, an inwardly projecting flange which is welded to the underlying metal surface.

Thus it is clear that the flange was relied upon as a distinction over the patent office cited references.

In an argument to distinguish the flange disclosed in the cited reference of Fromm (PX 7), Kutzer said:

there is no suggestion that the flange [in Fromm] be incorporated in the retainer of Hutchison. Granted such a modification of the Hutchison retainer could be

accomplished, but to do so would be completely unobvious as it would totally defeat the purpose of Hutchison, . . . .

(PX 2, p. 38, *ll.* 20–24.)

Again the importance of the flange was relied upon to distinguish the prior art, when Kutzer said that the claims as amended, including the flange at the bottom of the retainer, prevent the fusion of the retainer bottom to the metal surface as would occur in the cited prior art. Thus, the claims were amended "to clearly indicate that the flange (shoulder 18) is welded, not the entire bottom." (PX 2, p. 35, *l.* 25 and p. 38, *l.* 10.)

The Court concludes that, by the amendment filed February 26, 1970, the independent claims were amended in one respect only, that is, to require an inwardly projecting flange at the bottom of the passage of the retainer.

Carborundum, relying upon *Trio Process Corp. v. L. Goldstein's Sons, Inc.*, 461 F.2d 66, 75 (C.A.3, 1972) and *Johnson & Johnson v. W. L. Gore & Associates, Inc.*, 436 F.Supp. 704, 731 (D.Del.1977), argues that the February 26, 1970 amendment was a mere clarification of terminology used in the previous independent claims, and that it was not filed for the purpose to distinguish over prior art but rather better to describe the claim element. Indeed, Carborundum points to an argument made to the patent examiner to the effect that the "flange is not essential" (PX 2, p. 26). However, this argument was made early in the prosecution when the broadest claims did not require any particular shape for the inner surface of the retainer. (*Id.*) By specifically amending the broadest claims later in the prosecution (PX 2, pp. 33–35) to require an inwardly directed flange in the passageway, and then arguing the specific distinctions of the flange over the cited prior art, applicant certainly did more than redraft the claims merely to promote clarity. The Court concludes that such change redefined and substantially narrowed the claimed invention and provided a basis for the application of the doctrine of file wrapper estoppel.

The significance of file wrapper estoppel was discussed in *Autogiro Company of America v. United States*, 384 F.2d 391 (Ct. Cl.1967) as follows:

When the application is rejected, the applicant will insert limitations and restrictions for the purpose of inducing the Patent Office to grant his patent. When the patent is issued, the patentee cannot disclaim these alterations and seek an interpretation that would ignore them. He cannot construe the claims narrowly before the Patent Office and later broadly before the courts. File wrapper estoppel serves two functions in claim interpretation; the applicant's statements not only define terms, but also set the barriers within which the claim's meaning must be kept. These results arise when the file wrapper estoppel discloses either what the claim covers or what it does not cover.

*Id.* at 399.

█ The doctrine of file wrapper estoppel is more than a mere defense; it is a basic tenet of claim construction. In *General Instrument Corp. v. Hughes Aircraft Company*, 399 F.2d 373 (C.A.1, 1968) the court stated at 385, that "what is at issue is not merely a contest between the parties but a public interest that canceled or rejected claims not be revived and restored." Thus, the file wrapper may limit the meaning of the claim language whether Carborundum is asserting literal infringement or infringement under the doctrine of equivalents.

█ Furthermore, the doctrine of equivalents is subservient to the doctrine of file wrapper estoppel. In *Autogiro Company of America v. United States*, 384 F.2d 391 (Ct. Cl.1967), the court said:

The doctrine of equivalents is subservient to file wrapper estoppel. It may not include within its range anything that would vitiate limitations expressed before the Patent Office . . . . Thus a patent that has been severely limited to avoid the prior art will only have a small range

between it and the point beyond which it violates file wrapper estoppel.

*Id.* at 400–401.

File wrapper estoppel can arise under a variety of circumstances. In one situation, the applicant, when faced with rejections based on prior art, amends the claims to avoid the art. The amendment thus forms the basis for the estoppel. In another situation, the application is rejected on the basis of prior art, but the applicant succeeds in overcoming the rejection without amending the claims, by arguing that the claims properly define over the prior art. In this situation, the argument is the basis for the estoppel.

In *Exhibit Supply Company v. The Ace Patents Corp.*, 315 U.S. 126, 62 S.Ct. 513, 86 L.Ed. 736 (1942), the classic case on file wrapper estoppel by amendment, the Court said that:

> By amendment he [the patentee] recognized and emphasized the difference between the two phrases and proclaimed his abandonment of all that is embraced in that difference.... The difference which he thus disclaimed must be regarded as material, and since the amendment operates as a disclaimer of that difference it must be strictly construed against him.

*Id.* at 136–37, 62 S.Ct. at 518–519.

More recently, in *Coleco Industries, Inc. v. The United States International Trade Commission*, 573 F.2d 1247 (C.C.P.A., 1978), the C.C.P.A. took a broad view of estoppel by argument and at 1257–58 stated that:

> A patentee having argued a narrow construction for his claims before the United States Patent and Trademark Office (PTO) should be precluded from arguing a broader construction for the purposes of infringement.
>
> *     *     *     *     *     *
>
> A response to an examiner's office action may include an amendment accompanied by remarks or it may include only remarks. Because applicant's ultimate goal in submitting amendments and offering arguments in support thereof is the securing of a patent, we find no reason not to extend the traditional estoppel doctrine beyond estoppel by amendment to estoppel by admission.

*See also Westinghouse Electric Corporation v. Hanovia Chemical & Manufacturing Company*, 179 F.2d 293, 296–97 (C.A.3, 1949) (applicant's statement that an ordinary activated electrode was not operative in his inventive combination was held to preclude his issued claims from covering an accused combination which had an ordinary activated electrode, even though the claims had not been amended).

Thus, the Court concludes that the Kutzer patent, under the doctrine of file wrapper estoppel, is confined to a retainer that requires "an annular, inwardly directed flange projecting into said passage adjacent to the smaller end of said retainer." (PX 1.) However, an eyeball examination of C–E's retainer clearly shows that it does not have such a flange projecting into the passageway of the retainer at its lower end.[8] Furthermore, the Court finds other convincing credible testimony supporting the Court's examination. (R 89, 96, 150, 152–53; 133–34.) Consequently, the Court holds that C–E's product does not infringe the Kutzer patent.

## IV. THE ON SALE ISSUE

On April 26, 1966, one year and three months prior to the 35 U.S.C. § 102(b) bar date of August 2, 1967, Carborundum shipped to Bethlehem Steel Corporation abrasion resistant ceramic tile. (DX 2.) Carborundum also shipped to Bethlehem the attaching means for the tile. However, Bethlehem decided not to use the metallic retainers in its test of the ceramic material and returned the retainers to Carborundum. Had Bethlehem used the metallic retainers, they would have been used according to Claim 7 of the Kutzer patent to form the

---

**8.** At the beginning of the trial Carborundum's counsel passed up to the Court Kutzer's weld plug and C–E's weld plug. (R 3, 6, 10.)

combination defined in Claim 1. (DX 69, ¶ 22; DX 19, pp. 14–20, 36–38, 114–16; DX 3; DX 4.) In particular, Mr. Kutzer testified (DX 19, pp. 115–16):

Q: Is it true, then, that the parts that were sold and shipped by Carborundum to Bethlehem were intended to be installed to produce the combination defined in Claim 1?

A: Yes.

Q: Were the parts shipped to Bethlehem intended to be installed in accordance with the method as defined in Claim 7?

A: Yes.

When Mr. Kutzer was asked whether this sale to Bethlehem was a commercial sale for profit, he replied that in his personal estimation it was not but was rather intended to obtain a test and upon further questioning he then testified as follows (DX 19, pp. 114, 115):

Q: And what was the test for?

A: A test of the material itself in conjunction with, and in comparison with competitors' material, and the particular installation.

Q: The test, then, would have nothing to do with the fastening arrangement?

A: No.

■ In view of the testimony, it is clear that the delivery of the metallic retainers to Bethlehem Steel had nothing to do with the testing of or experimentation with the retainers themselves, but only with the ceramic tile *per se*. There is no evidence whatsoever that the metallic retainers were supplied under any arrangement for, or expectation of, receiving test results from Bethlehem relating to the Kutzer attaching means. The transaction with Bethlehem, therefore, cannot be characterized as an "experimental" exception to § 102(b). The authorities for this statement will be discussed later in conjunction with the sale to Wheeling Steel Company.

Carborundum argues that there was no offer to sell or sale of the retainers to Bethlehem. The fact that the retainers were supplied to Bethlehem without charge along with the tile is not determinative as to whether they were on sale. As the court said in *Roller Bearing Company of America v. Bearing, Inc.*, 322 F.Supp. 703 (E.D.Pa. 1971):

The bearings were given gratis to HYDRECO and were not placed into any pumps destined for sale.... [T]he principal intent of R. B. C. was not merely to obtain additional test results, but to convince HYDRECO of the reliability of the SJ–74197 [bearings]. It was anticipated that the test results, if favorable, would culminate in further sales.

322 F.Supp. at 707. *See also Tool Research and Engineering Corporation v. Honcor Corporation*, 367 F.2d 449, 453 (C.A.9, 1966), where the Court of Appeals for the Ninth Circuit stated that "one sale or *gift* of an article is sufficient to constitute a sale or public use" (emphasis added).

Carborundum also contends that the invention had not been reduced to practice when the subject matter of the patent was delivered to Bethlehem because there is no proof that the combination defined in the claims of the patent in suit was ever effected or that the method defined in Claim 7 of the patent in suit was ever carried out by Bethlehem, or for that matter, even by Carborundum prior to the shipment of the ceramic tile to Bethlehem. In this regard, Judge Wright of this Court stated in *Philco Corporation v. Admiral Corporation*, 199 F.Supp. 797 (D.Del.1961) that:

The Court would agree with the broad language in Burke to the effect that the term "reduction to practice," in a strictly legal sense, is not relevant to the "on sale" issue. It does not believe, however, this proposition leads inevitably to the conclusion that production models must be in existence. What is required is that the inventor has some degree of certainty as to the nature and usefulness of the finished product. This must be determined in light of the circumstances of each case.

199 F.Supp. at 817 n. 72.

The circumstances of this case reveal that Carborundum supplied ceramic tile and

weld plugs to Bethlehem. These ceramic tiles and weld plugs were to be used by Bethlehem by attaching them to Bethlehem's equipment in accordance with the invention. (DX 19, pp. 116–17.) Therefore, the customer, Bethlehem, was aware of the manner in which the tile and weld plugs were to be used to attach them to Bethlehem's equipment and the nature of the finished product was certainly obvious in view of the products delivered to Bethlehem by Carborundum. The fact that Bethlehem never used the weld plugs is immaterial; they were delivered. In *Johns-Manville Corporation v. Certain-Teed Corporation*, 196 U.S.P.Q. 152, 157 (C.D.Cal.1977), the court stated:

> This transaction did not involve an actual sale or a contract sale. Strictly speaking, there was no offer to sell, either, since Kellogg was not a potential buyer; it only specified items for possible purchase by subcontractors. However, Spinner's activities undeniably constituted a premature "commercial exploitation" or "attempt to sell" the one-piece elbow cover, which the statute prohibits.

> \*　　\*　　\*　　\*　　\*　　\*

> Several cases hold that the distribution of samples may constitute placing an item on sale.

> \*　　\*　　\*　　\*　　\*　　\*

> This Court concludes that the donation of the sample elbow cover in commercial context constituted a placing on sale, even though there was no concurrent sale
> . . . .

The Bethlehem deal, however, was not the only commercial activity. Following the return of the retainers by Bethlehem, there was little activity with respect to the subject matter of the Kutzer patent until about January 10, 1967. On the latter date, still prior to the August 2, 1967 bar date, Mr. Kutzer placed an internal Carborundum prototype order for samples with weldable retainers. (DX 5.) These prototype samples were assembled and welded to an underlying metal surface so that they were constructed according to Claim 7 of the Kutzer patent to produce the combination of Claim 1. (D.I. 69, ¶ 23; DX 6; DX 19, pp. 31–33 & 118–19.)

The subject matter of the Kutzer patent was reduced to practice in early 1967 at the time the prototype samples were manufactured. Regarding this reduction to practice, Mr. Kutzer testified as follows (DX 19, pp. 39–40):

Q: These pieces that were sent to field salespeople of Carborundum, and to Mr. Combs in Cleveland, or in Ohio, as indicated in Defendant's Deposition Exhibit 6, were they welded together by Carborundum, before being sent out?

A: Yes.

Q: As far as you were concerned at this time, were these pieces satisfactory, that is, was the attachment of the non-metallic material to the metal substrate on these sample pieces satisfactory?

A: Yes.

Q: Did you conduct tests of the attaching means at that time, or in that period of time?

A: Yes.

Q: What sort of tests?

A: . . . we welded experimental tile to a steel backing plate, break the plate off, attempt to remove the retainers, and even had them welded to steel backing plate that could be handled in the machine shop. And they were bisected in order to examine the welds.

Q: And these tests indicated that the attaching means was a satisfactory attaching means?

A: Yes.

Q: Was there any problem in welding the metallic retainers to the metal substrate?

A: Would you be more specific?

Q: Did you consider the welding, the actual welding process that was used in forming these samples, as a practical way of attaching the non-metallic pieces in the field?

A: Yes.

Continuing his testimony on the reduction to practice, Mr. Kutzer further testified (DX 19, pp. 121–24):

Q: Yesterday you made some reference that you had tested this invention, but you made no reference as to when and precisely what was done. Could you elaborate on that, please?

A: No, I believe I did elaborate on it, and this testing was done following the preparation of the—or, let's say, the establishment of the PT 2088, which was the prototype.

Q: That is dated 1/10/67?

A: Right.

Q: You tested the invention subsequent to that?

A: Following that.

Q: What was the first test you conducted?

A: What was the first test?

Q: Yes.

A: Welding tile to a steel backing plate, smashing the tile off and attempting to remove the retainers by literally beating them to death.

Q: And when was this done?

A: I would say some time following the preparation of the PT 2088 weldable inserts, as illustrated by PT 2088–1.

Q: Is it fair to say that the tests were conducted prior to the preparation of the so-called samples for various salesmen and for Mr. Combs?

A: Not prior to.

Q: Would the tests have been conducted subsequent to that?

A: No.

Q: That only leaves during?

A: Parallel with.

Q: The indication in Defendant's Deposition Exhibit 6 is that the samples for Combs were shipped on March 1, '67, and that the date of the prototype order for various salesmen was May 10, 1967.

Q: Could you, in view of those dates, could you say that prior to August 2, 1967, you had done sufficient testing so that you could say that this was a satisfactory way to fasten a nonmetallic member onto a metallic backing strip?

A: Yes, sir.

The Court concludes from this testimony that the subject matter of the Kutzer patent was reduced to practice and fully tested at least by May 10, 1967.

The order form (DX 5) of January 10, 1967 indicates that the prototype samples ordered were "requested by customer" and one of these samples was shipped on or about March 1, 1967 to a Carborundum salesman, Mr. W. B. Combs, in Cleveland, Ohio "For Bill Malone—Republic Steel." (D.I. 69, ¶ 23; DX 5; DX 19, pp. 23–24.) Ten additional prototype samples were ordered by Mr. Kutzer on May 10, 1967 (DX 7). This second order form indicates that these samples were "Requested by field sales and potential customers." Regarding these latter prototype samples, Mr. Kutzer indicated that they were "a hand sample to illustrate the item that Carborundum was proposing as a method of attachment, and the material for wear-resistant applications. It was designed for the salesman to carry it in his briefcase." (DX 19, p. 24.) Mr. Kutzer testified (DX 19, p. 120) as follows:

Q: I believe that you have testified yesterday that the purpose of these samples was such that the salesmen could show them to potential customers for the purpose of soliciting orders?

A: Yes.

Q: Were these orders to be orders which would be commercial sales for profit?

A: They could be.

Mr. Kutzer also testified regarding the second prototype order of May 10, 1967 (DX 7) that these were hand samples for field men in various parts of the country. Mr. Kutzer indicated that the note on DX 7 which reads, "Requested by field sales and potential customers" indicates that these pieces were going to be shipped to various

field men who were sales people. (DX 19, pp. 26–27.) He further testified that the note on DX 7 to Guy Bernardi indicating that the brick and retainers have a new designation number shows that the product was moving from the prototype stage and the small quantity stage into larger quantities to be handled by the manufacturing department rather than the prototype or small group. He further testified that the new designation number is a standard Carborundum part number and that standard drawings were being prepared for the engineering file. (DX 19, p. 28.) Mr. Kutzer was then asked the purpose of sending these samples to the field sales representatives of Carborundum and he testified as follows (DX 19, p. 30):

A: O. K., these were hand samples that a field man could carry in his briefcase to illustrate for prospective customers the Carborundum wear alumina abrasion resistant material, the hollow conical method of attachment that Carborundum had available.

Q: Was that for the purpose of soliciting orders from customers?

A: Yes.

When Mr. Kutzer was asked in his Deposition whether he could tell from the documents when the prototype sample was shipped to Mr. Combs, he stated (DX 19, p. 24):

I would say, based on the copy of the order, that the one part was shipped to him on March the 1st, 1967.

Mr. Combs, the intended recipient of one of these prototype samples, testified at his Deposition (DX 21) that he could not recall receiving the specific samples referred to in the prototype order (DX 5) but that, "I know I asked for samples, and I know they sent me samples, and I know I talked to Bill Malone and showed him the samples, and he liked them, you know, and used them" (DX 21, pp. 6–7.) Although Mr. Combs could not recall the specific date of receiving samples or of showing them to Bill Malone at Republic Steel, he testified that, "The best I can guestimate in going by this, by this 3/1/67, I would say within 2 weeks or cer-

tainly a month after I received them, I would have taken them in and shown them to Bill at his convenience, you know." (DX 21, pp. 9–10.) When asked the purpose of showing these samples to Bill Malone, Mr. Combs replied, "The purpose, of course, this strictly would be to sell that particular product to them, to Republic Steel." (DX 21, p. 13.) Mr. Combs further testified (DX 21, pp. 16–18):

Q: When you first showed samples to Mr. Malone, did you indicate that this was a product that was for sale by Carborundum?

A: Sure, yes.

Q: Did you indicate that Carborundum wanted to test this material at Republic Steel?

A: I indicated that I wanted Republic Steel to test them, sure.

Mr. Combs further testified as follows (DX 21, p. 22):

Q: Now what was the purpose of the testing you asked Bill Malone to perform?

A: To see that they like it, and the ease—to start there was concern. About the only concern involved was time, how much time it would take to install them, welding, rather than the previous method of just slapping some epoxy on it and sticking it in. So one of the first things we always wanted the customer to do was weld it himself, give it to a welder and say "Weld this," and tell him, see how long it takes and incorporate that in your thinking as to why you would want to use it.

Because it doesn't take long, you know, three seconds and you have got a nice weld. And a welder does that one time, and they realize that. So that's your objective on a sample, it is to get them to weld it and see, you know, the time involved.

Q: So would you agree that the purpose of the test was for Republic to determine whether they were satisfied with the product?

A: With the product.

Q: That's right?

A: Yes.

Q: With the Weld-Al product?

A: Yes.

The above evidence clearly and convincingly establishes that the subject matter of the Kutzer patent was reduced to practice no later than May, 1967 and the plaintiff does not appear to dispute that. (D.I. 77, p. 87.) It is also clear from the testimony of Messrs. Kutzer and Combs and the documentary evidence (DX 5, DX 6, DX 7) that the prototype samples sent to Carborundum salesmen were for the purpose of demonstrating the invention to potential customers and soliciting orders.

Plaintiff argues that "the manufacture of these ten prototypes for test purposes or for demonstration purposes by field sales representatives did not constitute a sale or placing these attachments on sale." Of course, the mere manufacture of the prototypes was neither a sale or placing on sale nor were the prototype samples themselves on sale. But this is beside the point. The evidence is quite clear that these prototypes were dispatched to Carborundum's salesmen for purposes of soliciting orders. This activity unquestionably amounted to placing the subject matter of the Kutzer invention on sale.

In this regard, Mr. Kutzer testified (DX 19, p. 121):

Q: Were the structures of the samples, which I understand were prepared, and so far as you know, distributed to the salesmen prior to August 2, 1967, then on sale to the purchasing public?

A: I would say they were available. It was during this period of time, more specifically, April 20, 1967, that Mr. Kutzer first submitted his invention disclosure to the Carborundum Patent Department. (D.I. 69, ¶ 21; DX 1.)

Following the manufacture of the prototype samples and following the submission of the invention disclosure by Mr. Kutzer, a carborundum salesman held a meeting on May 16, 1967 with Wheeling Steel Corporation and discussed the Carborundum weldable ceramic shape at which time Wheeling Steel indicated it would issue a purchase order to obtain a few samples for trial. (D.I. 69, ¶ 24; DX 8; DX 19, pp. 42, 43, 66.) After this meeting, a telephone order was placed by Wheeling Steel to Carborundum on July 14, 1967 which was confirmed by a written Wheeling Steel purchase order issued the same date. (D.I. 69, ¶ 25; DX 9, DX 10.) These activities also occurred prior to the 35 U.S.C. § 102(b) bar date of August 2, 1967. While this order was not shipped by Carborundum to Wheeling Steel until September 12, 1967 (D.I. 69, ¶ 25; DX 11; DX 19, pp. 44–46), the pieces that were shipped were the ceramic tile and the weld plugs in unassembled form for attachment to Wheeling Steel's equipment. The Wheeling Steel equipment, thus, formed the "underlying metal surface."

The Court must conclude from Carborundum's activities with respect to the prototype samples which were used by salesmen to solicit orders from potential customers, and the sale to Wheeling Steel, that the subject matter of the Kutzer patent was "on sale" prior to the § 102(b) bar date of August 2, 1967.

Carborundum in an attempt to undermine this conclusion has advanced several arguments and contentions which will now be addressed. First, Carborundum contends that C–E failed to sustain its burden of demonstrating that the sale was of an item substantially identical to that claimed in the Kutzer patent. The Court finds no merit to this contention. With respect to the prototype samples, they were assembled and welded to an underlying metal surface so that they were constructed according to Claim 7 of the Kutzer patent to produce the combination of Claim 1. The nonmetallic article was alumina (ceramic) so that Claim 2 of the Kutzer patent was also followed. (D.I. 69, ¶ 23; DX 6; DX 9; DX 19, pp. 31–33 and 118–19.) Thus, it is clear that the subject matter defined in Claims 1, 2 and 7 was "on sale" at the time the prototype samples were used by Carborundum

salesmen to solicit orders such as the delivery of one of the prototype samples to Republic Steel by Mr. Combs.

Furthermore, the sale to Wheeling Steel constituted the placing on sale of the subject matter of Claims 1, 2, 3, 4, 5 and 7 of the Kutzer patent (Claim 6 is not at issue in this litigation). The attachment of ceramic tile to underlying metal surfaces was not a new idea at the time Mr. Kutzer conceived his idea. Abrasion resistant ceramic tiles were already being sold to customers along with various types of attaching means which the customer would use to attach the tile to the customer's own equipment or underlying metal surface. (R 25; 26; DX 19, p. 8; PX 9, pp. 14–22.) The Kutzer idea merely involved a different form or method of attachment which was claimed in the Kutzer patent by way of combination Claims 1–5 and method Claim 7. Clearly then, when Carborundum sells two of the three components of the combination to the customer which already owns the third component of the combination (the underlying metal surface) with instructions as to how the attachment is to be made, that the invention, whether it be the combination Claims 1–5 or the method Claim 7, is "on sale." *See Delong Corp. v. Raymon International, Inc.,* 204 U.S.P.Q. 368, 372 (D.N.J. 1979), *aff'd in part on ground cited and reversed in part on other grounds,* 622 F.2d 1135, 1141 (C.A.3, 1980). There is no question that Carborundum did sell the subject matter of Claims 1, 2 and 7 to Wheeling Steel. With respect to Claims 3, 4 and 5 of the Kutzer patent which respectively add the short retainer, the cover for the retainer, and a cover of the same material as the ceramic liner, it must be noted that the order from Wheeling Steel (DX 10) specifically states, "but without ceramic inserts." Although the ceramic inserts or covers were not supplied to Wheeling Steel, they were nevertheless "on sale" even though Wheeling Steel did not purchase them. Consequently, the Court concludes that the subject matter of all the claims in issue, 1 through 5 and 7, was either sold or on sale to Wheeling Steel.

Second, Carborundum contends with respect to the Wheeling Steel sale that the items ordered were not delivered until September 12, 1967 which is after the bar date of August 2, 1967. However, 35 U.S.C. § 102(b), relates to "on sale" and not only to an actual sale. The invention was clearly on sale to Wheeling Steel at least as early as July 14, 1967 (DX 10) and probably as early as May 16, 1967 when the Carborundum salesman made the sales call on Wheeling Steel. (DX 8.) Furthermore, it is well settled law that the delivery date is not the date of the "sale" for purposes of 35 U.S.C. § 102(b). This Court, in *Chromalloy American Corporation v. Alloy Surfaces Co., Inc.,* 339 F.Supp. 859 (D.Del.1972), stated at 339 F.Supp. 869:

> When an invention is offered for sale more than one year before the patent application is filed, it is "on sale" within the meaning of 35 U.S.C. § 102(b), even if an actual sale has not occurred. This is true, even when (a) but one offer has been made to but one customer; (b) the prices are only estimated rather than established; (c) no commercial production runs have been made; and (d) the alleged invention is never sold.

> \*　　\*　　\*　　\*　　\*　　\*

> The facts are inescapable that Plaintiff for more than a year prior to filing the parent patent application actively attempted to sell its U process coating for superalloy metals and, therefore, the patent is invalid under 35 U.S.C. § 102(b).

The *Chromalloy* case cites Judge Wright's opinion in *Philco Corp. v. Admiral Corp., supra.* Judge Wright, at 199 F.Supp. 815, stated as follows:

> Many cases have stated that an actual sale was not necessary to bring the statute into play, an offer to sell being sufficient.

> \*　　\*　　\*　　\*　　\*　　\*

> In these cases, the fact that the goods sold had to be manufactured subsequently was of no significance.

Judge Wright then examined a series of cases in which it was held that the device

must be in being and ready for delivery to be "on sale." However, Judge Wright pointed out that these were cases in which, for example, not even one model had been built and where the devices had to be tailor-made for the customer. Judge Wright then stated at 816–17:

There's no persuasive reason why the policy delineated so cogently in *Metallizing Engineering Co.*, [153 F.2d 516] *supra*, does not apply to the "on sale" portion of Section 102(b) and invalidates the '134 and '564 patents. The March showing to Firestone was clearly a competitive use of the Seventeener III and the patents embodied therein. It was a sales effort, Philco's purpose being to sell the Firestone representative on the new line and to persuade them to buy it.

\* \* \* \* \* \*

This was clearly a competitive use of the Seventeener III and would, if allowed, result in extension of the patent monopoly.

\* \* \* \* \* \*

Nor is the lack of production models of the Seventeener III persuasive. On March 27, Philco was only two months away from production. Firestone was relying upon Philco's past performance as far as electronic standards were concerned. The matter relevant to the claims of the patent was settled, and Philco knew almost exactly what it was going to sell in June. The requirement of existing production models laid down in the *McCreery* [195 F. 498] case is inapposite here. This is not, as it was in *McCreery*, a situation where the invention was conceived almost simultaneously with the signing of the contract, or a situation, as in *Burke*, [232 F. 145] where a "sample" contract is executed and neither party may know exactly what the finished article will be like.

The principles applied in *Chromalloy* are cited in and supported by the recent decision in *General Motors Corporation v. Toyota Motor Company, Ltd.*, 467 F.Supp. 1142, 1166 (S.D.Ohio 1979). In *In re Theis*, 204 U.S.P.Q. 188, 193 (C.C.P.A.1979), the Court

of Customs and Patent Appeals similarly stated that "The fact that the delivery may have occurred after the critical date is of no moment." *See also Trans-World Display Corporation v. Mechtronics Corporation*, 437 F.Supp. 692, 700 (S.D.N.Y.1977). The Court, therefore, concludes that the delivery date to Wheeling Steel is insignificant and the invention was certainly "on sale" prior to the bar date.

■ Finally, Carborundum argues that the sale to Wheeling Steel was an "experimental use." It is, of course, well established law that a use or sale for experimental purposes may be an exception to the § 102(b) bar. The issue is whether the sale to Wheeling Steel falls within the scope of the experimental use-sale exception. Carborundum argues that on the public use or sale defense asserted under 35 U.S.C. § 102(b), C-E's burden is the "beyond a reasonable doubt" standard. The Court has found no cases in the Third Circuit in which a higher standard than "clear and convincing proof" has been placed on the party alleging patent invalidity under 35 U.S.C. § 102(b). Rather, the Court of Appeals for the Third Circuit has only recently reaffirmed this apportionment of proof between the parties in such a situation in *Paeco, Inc. v. Applied Moldings, Inc.*, 562 F.2d 870 (C.A.3, 1977) at 872:

The learned district judge accurately stated the law concerning invalidity under § 102(b): Every patent comes into court clothed with a presumption of validity, 35 U.S.C. § 282 (1970); and the party challenging the validity of a patent bears a heavy burden of demonstrating by clear and convincing proof of prior use or sale of the patented invention or the patent's deficiency in some other respect. *See Trio Process Corp. v. L. Goldstein's Sons, Inc.*, 461 F.2d 66, 70 (3d Cir.), *cert. denied*, 409 U.S. 997, 93 S.Ct. 319, 34 L.Ed.2d 262 (1972). Once the party asserting invalidity has convincingly proven the prior use or sale, however, the burden shifts to the patentee to prove that any prior use, sale, or printed publication was for experimental, not commercial, pur-

poses. *Azoplate Corp. v. Silverlith, Inc.*, 367 F.Supp. 711 (D.Del.), *aff'd,* 506 F.2d 1050 (3d Cir.), *cert. denied,* 421 U.S. 914, 95 S.Ct. 1572, 43 L.Ed.2d 780 (1975).

This Court has already found that the subject matter of the Kutzer patent had been reduced to practice in early 1967, at the time the prototype samples were manufactured, well before the August 2, 1967 bar date.

The Carborundum salesman's report of his meeting with Wheeling Steel on May 16, 1967 (DX 8) states, "They were very interested and before I left stated they would issue a purchase order to obtain a few samples for trial as Coke Shaker Screen Skirt Boards." This clearly indicates that Wheeling Steel was going to test the product on its own behalf and not on behalf of Carborundum and there is *no* evidence whatsoever to the contrary. Carborundum, quoting from the Kutzer deposition (DX 19, pp. 141–42), points to the testimony that the sale to Wheeling Steel was a trial order. However, Carborundum fails to address the fact that the trial was being conducted on behalf of Wheeling Steel rather than Carborundum. The Kutzer testimony makes it clear that this was a trial on behalf of Wheeling Steel (DX 19, pp. 146–47):

Q: With respect to Defendant's Deposition Exhibit 9, which is a salesman's report, and which indicates that, "Wheeling Steel would issue a purchase order to obtain a few samples for trial," did Carborundum get any trial results back from Wheeling Steel?

A: Not to my knowledge, not that I am aware of.

Q: Would you classify this as a trial by Carborundum or a trial by Wheeling Steel?

A: I would classify it as a trial by Wheeling Steel.

Q: If trials were to be conducted, either by Carborundum or on behalf of Carborundum, with respect to the Kutzer idea that is embodied in the Kutzer patent, would you normally receive the results at such a trial?

A: Not me, necessarily.

Q: Would the Carborundum application engineering department receive it?

A: Not necessarily.

Q: Are you aware of any documents that Carborundum might have, that would indicate the results of the trial?

A: At this point, at this day in time, no.

There is no evidence whatsoever that Carborundum was to receive test results from Wheeling Steel. In *Chromalloy American Corp. v. Alloy Surfaces Co., Inc., supra,* 339 F.Supp. at 871, this Court stated as follows:

The law is well established that "the question of whether the use of an invention is experimental is basically a question of the intent of the patentee or the inventor"; it does not depend on the intent of the prospective customer or vendee. *Philco Corp. v. Admiral Corp., supra,* 199 F.Supp. at 817, 131 U.S.P.Q. [413] at 430; *Tool Research and Engineering Corp. v. Honcor Corp.,* 240 F.Supp. 296, 301, 145 U.S.P.Q. 249, 252 (S.D.Cal.1964), *aff'd,* 367 F.2d 449, 151 U.S.P.Q. 236 (C.A.9, 1966), *cert. denied,* 387 U.S. 919 [87 S.Ct. 2032, 18 L.Ed.2d 972] 153 U.S.P.Q. 888, *reh. denied,* 389 U.S. 893 [88 S.Ct. 17, 19 L.Ed.2d 203] (1967). Thus any tentativeness on Pratt & Whitney's part as to whether it would order commercial scale production of plaintiff's U coating for its WI-52 vanes or whether it wished to conduct further evaluation of the process has absolutely no bearing upon the question whether this was good faith *experimentation on the part of plaintiff.* (Emphasis added.)

The fact that the sale to Wheeling Steel was a commercial sale rather than some experimentation is confirmed by the evidence of record. A memorandum from the inventor, Mr. Kutzer, dated February 14, 1968 (DX 15), relating to Mr. Kutzer's idea Memorandum (DX 1), indicates that the shipment to Bethlehem Steel was to have been the first field installation but that this was not to be the case since the customer

chose to use other fastening means and returned the hollow conical weldable steel retainers. The memorandum then states as follows:

> As you requested, we are also attaching a copy of an invoice which covers the first commercial sale of one of the alumina shapes for attachment using this hollow conical weldable retainer method where the material was installed within a reasonable time after the date of shipment, and in accordance with the principles covered by the subject memorandum. This invoice [9] is dated 9–12–67, Wheeling Steel Corporation, Wheeling, West Virginia, and was our order no. 07–198–023.

In another memo from Mr. Kutzer dated 4–17–68 (DX 16), Mr. Kutzer stated as follows:

> Several weeks ago I was asked by Bob Flynn to provide the sales figure for our Weld-Al alumina for the last quarter of 1967. It developed that though this product did not get off the ground with the first commercial sale of the shapes until 9–12–67 to Wheeling Steel, the last quarter sales amounted to a handsome＿＿＿＿$33,000! ! !

Referring to DX 16, Mr. Kutzer's deposition reads as follows (DX 19, pp. 52–53):

Q: In the first paragraph of this memorandum, you indicated that the first commercial sale of the shapes did not get off the ground until 9–12–67 to Wheeling Steel; is that correct?

A: Yes.

Q: So at this point, when you wrote this memorandum, you considered that sale to Wheeling Steel to be a commercial sale?

A: Of the shapes, yes.

Q: Did you consider it to be a commercial sale of the attaching means?

A: Only as a supplementary part of the order. We did not sell it as an attachment—as an assembled unit.

Q: But you sold hollow conical weldable retainers, along with the shape, as the means for attaching the shapes; is that true?

A: Yes.

Although Mr. Kutzer has identified the date of the sale to Wheeling Steel as 9–12–67, the Court has found, above, that the actual date of this sale was July 14, 1967 and that it was "on sale" at the time of the salesman's call on May 16, 1967. Then in reference to DX 15, Mr. Kutzer testified as follows:

Q: Referring back to Defendant's Deposition Exhibit 7, in the fourth paragraph thereof, it is indicated that a copy of an invoice was attached to this memorandum, which is Deposition Exhibit 7, and indicates that the invoice covers the first commercial sale of one of the Alumina shapes for attachment using this hollow conical weldable retainer method; is that accurate?

A: Yes.

\*　　\*　　\*　　\*　　\*　　\*

Q: Would it be accurate to say, from this paragraph 4 in Exhibit 7, that you, at that time, considered the sale to Wheeling Steel as represented by the invoice dated 9–12–67, as being a commercial sale of the shapes for attachment, using the retainers referred to in that paragraph?

A: Yes.

The experimental use doctrine "allows an inventor a reasonable period of experimentation wherein he may perfect his ideas, provided the inventor truly has utilized the public use or sale to that laudatory end, not as a competitive tool to exploit his invention and gain an advantage over others." *Paeco, Inc. v. Applied Moldings, Inc., supra*, 562 F.2d at 874. On the evidence in this case, the Court finds by clear and convincing evidence that (1) the subject matter of the Claims 1–5 and 7 were embodied or obvious in view of the items offered for sale in the form of prototype samples sent to Carborundum's salesman in early 1967 and which were sold to Wheeling Steel and therefore

---

9. The invoice referred to in this quote is DX 11.

was on sale and sold at that time, (2) the invention was reduced to practice and tested sufficiently by the inventor to verify that it was operable, and (3) the offers to sell and the sale to Wheeling Steel were for commercial rather than experimental purposes. *Timely Products Corp. v. Arron*, 523 F.2d 288, 302 (C.A.2, 1975).

Furthermore, Carborundum has not sustained its burden of proving experimental use even by a preponderance of the evidence much less the clear and convincing burden which is required.

Accordingly, the Court concludes that the Kutzer patent is clearly invalid because Carborundum in violation of 35 U.S.C. § 102(b) placed the subject matter of the patent "on sale" in this country and consummated a sale to Wheeling Steel more than one year before the plaintiff applied for the patent on August 2, 1967.[10]

## V. ATTORNEY FEES

C-E has requested an allowance of attorney fees under 35 U.S.C. § 285. This application, however, will be denied because the Court finds no bad faith or other equitable considerations of similar import which would make it greatly unjust for C-E to take care of its own counsel fees. Moreover, the claims of Carborundum were not so completely devoid of substance as to warrant the conclusion that the purpose of the suit against C-E could only be for harassment.

The above shall constitute the Court's findings of fact and conclusions of law required by Rule 52(a), F.R.Civ.P.

Judgment will be entered in accordance with this opinion.

---

**10.** In view of the finding of invalidity based on 35 U.S.C. § 102(b), it is unnecessary to discuss C-E's other grounds of invalidity.